**William Alfred HUFFSTUTLER,**
Appellant,

v.

**HERCULES POWDER COMPANY,**
Appellee.

No. 18675.

United States Court of Appeals
Fifth Circuit.

May 30, 1962.

Rehearing Denied Aug. 1, 1962.

Hugo L. Black, Jr., Cooper, Mitch, Black & Crawford, Birmingham, Ala., for appellant.

James R. Forman, Jr., Birmingham, Ala., for appellee.

Before CAMERON and WISDOM, Circuit Judges, and THOMAS, District Judge.

DANIEL HOLCOMBE THOMAS, District Judge.

This is a personal injury action against a manufacturer. After many hours' deliberation and reports to the court that the jury was hopelessly deadlocked, a verdict was finally returned for the plaintiff in the amount of $12,500. Subsequent thereto, a motion was filed by the defendant to set aside the jury verdict, which motion the court granted. The case is here on appeal from the setting aside of the verdict by the trial court.

Plaintiff Huffstutler worked as a coal loader in a wagon mine owned by one Alf Renshaw. His job was to blast coal loose with dynamite at the end of every shift, and to load the loose coal out by means of horse-drawn vehicles on the next shift. On September 27, 1958, the plaintiff had finished loading out his coal somewhat earlier than usual and completed his preparations for blasting. For safety's sake, he could not blast until his fellow workers in the mine were ready with their blasting also. To fill up the waiting time, he headed for an old worked-out room in the mine. This room had been used as a powder room to make up explosives, but was not being used for any purpose at the time. It had been abandoned three to six months before. Sometime prior thereto, Huffstutler had left in this room a blasting cap box loaned to him by Renshaw, which Renshaw had instructed him to pick up and start using.

For light, Huffstutler and the other miners used carbide lamps attached to their caps. The lamp had an open flame with a reflector. Huffstutler entered the abandoned powder room, lighted only by the carbide lamp worn on his cap. The height was not sufficient for a man to stand fully upright. Extending from the left-hand wall of this room, five or six feet in an irregular pile, twelve to twenty-four inches high, was a heap of waste rock called gob. The travel area of this room spread about twelve feet from the foot of the gob to the right-hand wall of the room. Tracks for the mule-drawn rail cars ran down this traveling area and were almost covered by loose coal which had dropped from overloaded rail cars prior thereto.

The plaintiff walked into the room and turned toward the gob. He saw a quart-size fruit jar with some sort of top on it, lying on its side. He saw his cap box behind this fruit jar. Apparently, the jar was lined with rubber; thus Huffstutler could not see inside the jar. At least one of the miners (Dewey Cannon) kept his blasting caps in such fruit jars. There was evidence, slight though it was, tending to show that perhaps other of the miners also kept caps in similar jars. This was known to Huffstutler. As Huffstutler started to pick up the jar with his right hand (apparently with the intention of moving it so as to get the cap box), the jar exploded. As a result, Huffstutler was not only badly but permanently injured. There was evidence that he had sustained brain damage; and the evidence without dispute showed that he lost the sight of one eye, lost at least one finger, sustained a broken arm, and other very painful and serious injuries. He crawled bleeding along the tracks from the room to the main haulage way, where his fellow workers found him. They noticed a small piece of broken copper cap (or what they identified as copper) embedded in his neck. Plaintiff himself later picked fragments of metal (which he identified as pieces of copper cap) out of various parts of his body.

An inspector for the United States Bureau of Mines, investigating this explosion, found on the floor of the room, near where the accident occurred, hunks of zinc-colored stuff (probably from the fruit-jar top). He could not say what type of metal these were. They were much larger than the small fragments of metal which plaintiff picked from his own body.

The blasting caps used by the plaintiff and his fellow miners were bought from Renshaw, the mine owner. They were Hercules caps and were made of copper. The Hercules caps had been

used in the mine for a period of only four months prior to the explosion. Du Pont caps were used in the mine before they began using Hercules caps. The Du Pont caps were not copper colored.

The complaint and amendments thereto allege that the plaintiff's injuries resulted from the negligence of Hercules (1) in manufacturing the caps; (2) in failing to warn the plaintiff that the caps would explode prematurely unless handled and/or stored in a certain manner; (3) in manufacturing the caps in such a manner that they would become more sensitive and more likely to explode prematurely as they got older; and (4) in failing to warn the plaintiff that the caps had been manufactured in such a manner that they would become more sensitive and more likely to explode prematurely as they got older.

Hercules stored the kind of caps distributed by Renshaw anywhere from two or three months to two years at its manufacturing plant in Port Ewen, New York; anywhere from one-and-one-half to three months at its Bessemer, Alabama, magazine; and the middle man who delivered the caps to Renshaw stored them approximately thirty days in his magazine. The powder room where the accident occurred had not been used from three to six months.

Plaintiff offered the evidence of F. A. Griffits, professor of chemistry at Maryville College, Maryville, Tennessee, and professor of chemistry during the summer school session at Birmingham-Southern College, Birmingham, Alabama, and Alabama College at Montevallo, Alabama. Dr. Griffits has a Ph.D. in chemistry from the University of Indiana; is familiar with the authoritative literature of explosive chemicals in general and PETN and DDNP in particular. Hercules blasting caps contain powder charges of these two chemicals. Dr. Griffits himself has conducted experiments with related chemicals; has had some experience with blasting caps and chemical compounds of the DDNP family; has familiarized himself with experiments with DDNP and PETN by others; has discussed the properties and qualities of explosive chemicals with fellow scientists from time to time, and has made a study of PETN and DDNP.

Dr. Griffits testified that explosive chemicals in general, and PETN and DDNP in particular, become more unstable, deteriorate and decompose as they get older; that this aging process can make them more sensitive, more dangerous, and easier to set off by energy such as friction, heat, and shock. He said that in his opinion the chemicals in the blasting caps which had (allegedly) exploded in the jar had deteriorated from the aging process; that this deterioration had caused the caps to get in such a critical state that little or no energy would cause them to explode, and that the slight movement of the jar by the plaintiff, acting on the critical state of the caps due to age, had probably caused the explosion.

The defendant offered evidence by equally as well qualified experts who denied that age made PETN and DDNP or any other explosive chemicals or propellants more sensitive, and testified that if age did have any effect on PETN and DDNP and other explosive chemicals or propellants, in general it tended to make them harder to set off.

The evidence on behalf of Hercules showed that some of the miners brought carbide into the mine in glass jars; that carbide and water form acetylene gas, which is highly explosive when improperly handled; that the gas might form within an hour or so and be exploded by an open flame, such as a miner's lamp, or even by movement of the container.

■■ We believe that this sufficiently outlines the facts and there is no necessity for further elaboration. In ruling on the defendant's motion, the trial court wrote an opinion with which we are in thorough accord. We adopt, in affirming this case, the opinion of the trial court which is set out below in full:

"At the conclusion of the evidence in this cause, the defendant moved for a directed verdict. A ruling was reserved

on this motion. There was a verdict of $12,500.

"To justify recovery, plaintiff contends that the defendant failed to warn him and others similarly situated that its dynamite caps would become more sensitive with age, and thereby more likely to explode.

"The defendant vigorously denies the charge leveled at it and contends that the verdict is based on speculation pure and simple.

"I have read the transcript of the evidence and have made a careful analysis of same: I have also read the briefs and made a study of the authorities cited to me both on the oral arguments and in the briefs. I shall not attempt to detail the evidence other than to the extent necessary to answer the questions leading to the conclusion justified therefrom.

"1. *Were there blasting caps in the jar?*

"Dewey Cannon used a fruit jar for the storage of his caps. He seems by the more convincing evidence to have been the only one to use a fruit jar for this purpose, although witness Renshaw testified that 'they' took caps into the mine in fruit jars. Cannon's jar was accounted for and was not the jar here involved. Others used fruit jars for the storage of carbide. Some of the fruit jars had bronze colored tops. Hercules' caps are made of a commercial bronze consisting of 90 per cent copper and 10 per cent zinc. The witnesses who saw the plaintiff soon after his injury referred, by way of conclusion, to a fragment of metal imbedded in his neck as a piece of 'copper cap.' The doctors who removed the fragments from his body were unable to state whether they were copper colored or bright. The cap was on the jar. No witness was able to state whether it was bronze or white metal. This jar, according to plaintiff, was barely touched when it exploded. Some of the witnesses testified that a pit was blown in the floor of the mine. The mine inspector saw a place that could have been caused by an explosion on the gob where the jar was supposed to have

been located. When plaintiff saw the jar it was lying on its side. One of the defendant's witnesses testified that if it contained carbide and there was water in it, the tilting of the jar could have caused a gasification of that part of the contents not previously affected by the presence of water, thereby generating sufficient additional gas to carry the pressure beyond the critical stage causing the explosion. Also it was shown that plaintiff wore an open carbide light and smoked. [Plaintiff testified he was not smoking at the time.] Defendant's experts stated positively that merely touching the jar in the manner detailed by plaintiff could not have caused Hercules' caps to explode. The experiments conducted by the defendant substantiate this conclusion.

"Was the metal from a cap or was it from the jar top? If there were caps in the jar, did the defendant drop the jar; otherwise what caused the pit in the mine floor, if it was there, as some of the witnesses testified?

"2. *If there were caps in the jar, were these Hercules caps?*

"Hercules caps were first invoiced to Renshaw, the mine owner, by Burnett, the middleman, on May 29, 1958. This was exactly four months before the explosion occurred. Du Pont caps were used in the mine before they began using Hercules caps. One of the witnesses saw a jar about five weeks before the accident at about the point where plaintiff was injured. The jar was upright at that time. The witness did not know what was in the jar. Miners were hired from other mines and 'probably' brought their own caps when starting to work. At least three other companies made a copper shell cap; and, as above noted, bronze jar tops were used on some of the fruit jars taken into the mine.

"3. *If there were caps in the jar, and if these caps were Hercules caps, did plaintiff know or have cause to know that they were in the jar?*

"The answer to this question goes to the effectiveness of any warning that the

defendant might have been under duty to give. The law would not require a warning unless the warning would be effective under the circumstances prevailing. It could be effective only to those who would note and give heed.

"Plaintiff was not looking for this jar, but was looking for his caps-carrying box. He says that he saw this fruit jar lying on its side in front of his box, and that when he reached to remove it so as to get the box, the jar exploded. The box does not appear to have been damaged. Plaintiff testified as follows:

"Q. Now, Mr. Huffstutler, you didn't see what was in the glass jar?

"A. No, sir.

"Q. You didn't look to see what was in the glass jar, did you? ·

"A. No sir. It had a rubber around it, and you couldn't see. I didn't think nothing about it. No cap or nothing being in it.

"Q. It had a rubber around the glass jar?

"A. It was on the inside. I reckon the rubber was in there. Some of them said it was.

"Q. Did you see what was in it?

"A. No. I never saw what was in it.

\* \* \* \* \*

"Q. I am asking you about this particular fruit jar. You had not seen this fruit jar before, had you?

"A. No. I don't reckon. I don't know.

"Plaintiff told the mine inspector, Rejoinis, sometime after the accident, that being 'inquisitive (curious)' he 'decided to pick up the jar and see what was in it.'

"Under these facts, if we assume that · the caps became more sensitive with age and that the defendant had printed on its cap boxes, or on a pamphlet accompanying the boxes, a warning that the caps would become more sensitive with age, and thereby warned of the danger of handling caps that had become old, could such a warning have been effective

as to the plaintiff, who did not know that caps were in the jar, and thought 'nothing about it, no caps or nothing being in it'? The answer is evident. The warning could not have been effective.

"4. *If there were caps in the jar, if these were Hercules caps, were they old caps?*

"If there were caps, it is impossible from the evidence to determine the exact or approximate age of the caps. How long the caps were in the jar in the mine, or in Barnett's possession, or in the magazine at Bessemer, or at Port Ewen, New York, is unknown, and rests in speculation. They could have been 'new' caps, and in view of defendant's method of handling from manufacture to disposition, it is more likely that they were 'new' rather than 'old' caps.

"5. *If there were old caps, had they become more sensitive to explosion by age?*

"Plaintiff's witness, Griffits, had carried on no actual experiments with Hercules caps or on the sensitivity of DDNP or PETN from impact or aging. Defendant's experts have carried on actual tests as to the sensitivity of these chemicals to both impact and aging. These tests tend to establish that it would be impossible to explode Hercules No. 6 caps by no more impact than merely picking up a jar containing same; and that these chemicals with which the caps are charged, if they changed in any respect by age, would become less sensitive.

"6. *Assuming that these were old Hercules caps in the jar, and assuming that they became more sensitive to explosion by aging, did the defendant know, or, in the exercise of the care required of munitions manufacturers, should it have known that such was the case?*

"The experiments failed to reveal any such sensitivity. Experience failed to demonstrate the same. Mr. Coleman, defendant's local sales manager, testified that his office sold 140,000 No. 6 caps per month and that he had never received a

report of a premature explosion of any such caps. Dr. Lawrence, defendant's research and explosive chemist, in charge of its research and development program, stated that he had been with the defendant in the manufacture of No. 6 caps for 25 years, that during that time 300,000,000 No. 6 caps had been manufactured, and that he had never received a report that No. 6 caps would detonate spontaneously, or that the passage of two or three years or more would cause the caps to become more sensitive.

"Mr. Ramer, in charge of caps manufactured for the defendant and associated with the manufacture of No. 6 caps for twenty-four years, testified that defendant had manufactured 12,000,000 No. 6 caps yearly, and that he had never received a report of a spontaneous explosion of the No. 6 caps, or any indication or information that they would become more sensitive with the passage of years.

"7. *Was the defendant under a duty to print on the cap box, or on an accompanying pamphlet, a warning as plaintiff contends?*

"Aside from the effectiveness of a warning, both experiment and experience acquit the defendant of any such duty. Even a munitions manufacturer cannot be held to a standard of conduct lying beyond the periphery of both the foreseeable and the ascertainable.

"I have given this motion most careful study. The plaintiff has sustained severe and permanently disabling injuries—the kind of injuries that would elicit the sympathy of not only a jury but a judge as well. The Court's duty here, however, is well marked. I am of the opinion that the verdict rendered rests on speculation, pure and simple, and is unsupported by the evidence. The Court should have directed a verdict for the defendant. The defendant's motion is due to be granted."

We agree. The trial judge correctly granted defendant's motion for judgment *non obstante veredicto* as the verdict could only be based on speculation.[1] That judgment is

Affirmed.

## On Petition for Rehearing

PER CURIAM.

■ Implicit in the opinion of the trial court, which opinion we adopted in full, is that *res ipsa loquitur* has no application where, from the facts, appellee's connection to the unidentified exploding agent has not been shown. On the record as it appears to us, a jury finding that such connection exists, could only be based on speculation.

The petition for rehearing is

Denied.

---

1. See Theriot v. Mercer, 5 Cir. 1959, 262 F.2d 754.