**Adelbert LITTLEHALE and Erwin Zelanko, Plaintiffs,**

v.

**E. I. du PONT de NEMOURS & CO., Defendant.**

**No. Civ. 129–13.**

United States District Court
S. D. New York.

May 11, 1966.

Gair & Gair, New York City, H. A. Gair, A. Passman, New York City, of counsel, for plaintiffs.

Cravath, Swaine & Moore, New York City, H. R. Medina, Jr., New York City, of counsel, for defendant.

TENNEY, District Judge.

## OPINION

This is an action for alleged failure of defendant E. I. du Pont de Nemours & Company (hereinafter referred to as "Du Pont"), to warn of certain inherent dangers in the use of detonators (blasting caps) manufactured by it at its Pompton Lakes, New Jersey, Plant in August 1944, pursuant to a contract with the Ordnance Department of the War Department and in accordance with detailed specifications supplied by the Ordnance Department.[1] On July 17, 1957 (some 13 years later) an explosion occurred on board the U. S. S. SOMERSWORTH (hereinafter referred to as "SOMERSWORTH") on the high seas, injuring plaintiffs Littlehale and Zelan-

ko. At the time, the SOMERSWORTH was engaged in sound propagation tests being conducted by the United States Navy for its Underwater Sound Laboratories in New London, Connecticut.

The device, which exploded prematurely, consisted of three of these blasting caps, a fuse manufactured by the Ensign Bickford Company (not a defendant herein), and a TNT grenade, priming adapter and steel tubing or housing (each manufactured by an unknown company or person other than Du Pont).

Plaintiff Littlehale was a civilian employee of the Navy involved in said tests. Plaintiff Zelanko was a United States Navy seaman with a rating of apprentice fireman who was assigned to the SOMERSWORTH as a cook. He was an innocent bystander.

Based on the complaint herein, plaintiffs' and Du Pont's answers to interrogatories and exhibits attached thereto, the joint pre-trial memorandum and supplemental pre-trial memorandum, the pre-trial order, and the depositions of Messrs. Stratton, Batley, Jezek and Coar, and the exhibits introduced at such depositions, defendant Du Pont moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

In opposition thereto, there have been submitted affidavits of Robert Conason, Esq. (of counsel for plaintiffs), plaintiff Littlehale, and David Lee Von Ludwig, as an explosives expert.

The statements submitted herein, pursuant to Rule 9(g) of the General Rules of this Court, indicate that there are no genuine issues of fact to be tried except as to the sufficiency of the warning given, the training and experience of plaintiff Littlehale in the use of the blasting caps involved herein, and whether a leaflet "Don'ts for Blasting Caps" (Exhibit 1, annexed to Medina Affidavit of 2/10/65) was actually enclosed in the box of blasting caps furnished to Littlehale. Of course, if there was no duty on

1. Originally, Hercules Powder Company was named as a co-defendant, but the action was discontinued as to it.

the part of Du Pont to warn plaintiffs, these issues are not relevant and do not form any obstacle to consideration of the motion for summary judgment.[2]

■■ Du Pont bases its motion on the grounds that (a) Du Pont had no duty to provide any warnings and certainly not the kind plaintiffs claim; (b) even if such a duty existed it did not run to plaintiffs; (c) assuming Du Pont had a duty to warn, the warnings that it did provide met that duty;[3] and (d) plain-

2. "It is urged that a contest of the sort here involved can just as well be submitted to a jury, without a prior determination of possible liability on the part of the defendant. There is in some sociological circles a philosophy that the burden of damages suffered in accidents with manufactured articles ought to be widely spread, by way of the manufacturer and his available insurance, such as is the plan widely adopted in respect to injuries suffered in employment. But such a plan ought to be adopted, if it is to be adopted, by the voice of the people generally, expressed by the legislative branch of the government. It ought not be imposed by the judicial branch. To be sure, there are many respects in which the development of the common law calls for re-examination and change by the courts. The advances made by the courts in this very field by cases such as Huset [Huset v. J. I. Case Threshing Mach. Co., 120 F. 865 (8th Cir. 1903)] and MacPherson, supra, [MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916)] are illustrations. But so sweeping a change in commercial liability as the change just mentioned is not within that area. We must, when appropriate procedural demands have been made, determine at the outset of an action whether a possible liability in law of the defendant has been indicated by the plaintiff. This is a concept basic in our jurisprudence. It is established, firmly and correctly, that if a defendant has violated no legal obligation, his liability for pecuniary damages must not be submitted to the possible prejudices, sympathies or whims of a lay jury. His basic liability is first to be tested as a matter of law by the judge. In the case at bar the judge did not rule on the pleadings alone. The plaintiff's deposition was in, and so were the pertinent exhibits. If there is no possible liability in law, and no genuine issue of material fact exists, the established practice is summary judgment." Jamieson v. Woodward & Lothrop, 247 F.2d 23, 33, 101 U.S.App.D.C. 32, cert. denied, 355 U.S. 855, 78 S.Ct. 84, 2 L.Ed.2d 63 (1957); see Prosser, Torts § 36 at 207 (3d ed. 1964); cf., Davis v. Henderlong Lumber Co., 221 F.Supp. 129, 135 (N.D. Ind.1963), and cases cited therein. Pease v. Sinclair Ref. Co., 104 F.2d 183, 186

(2d Cir. 1939) is distinguishable as involving not only a failing to warn but also mislabeling which the jury could have found constituted negligence as to the intended purchaser—in fact, it did so find.

3. The caps were packed in boxes of 100. It is not disputed that the following text appeared on these boxes:

Cover.

100　　　　　　　Corps of Engineers
U. S. ARMY
SPECIAL BLASTING CAPS
Non-electric
Will Detonate Composition C
(Du Pont Oval)
Manufactured By
E. I. DU PONT DE NEMOURS
& COMPANY
Wilmington, Delaware

Front end.

BLASTING CAPS
Dangerous
Handle Carefully
DO NOT remove caps with wire or nail
DON'T tap or otherwise investigate them
DON'T carry caps loose in pocket

Right side.

BLASTING CAPS
DANGEROUS
HANDLE CAREFULLY
DON'T smoke near caps
DON'T store in a residence
DON'T shoot into caps
DON'T store with high explosives

Left side.

BLASTING CAPS
DANGEROUS
HANDLE CAREFULLY
Keep in a dry place
Keep open light away
Attach caps to fuse with a cap crimper not with knife or teeth

Rear end.

100　　　　　　　Corps of Engineers
U. S. ARMY
SPECIAL BLASTING CAPS
Non-electric
Will Detonate Composition C
Manufactured By
E. I. DU PONT DE NEMOURS
& COMPANY
Wilmington, Delaware

tiffs' action is barred by the applicable statute of limitations.

Certain facts are not disputed in the supplemental pre-trial order or in the depositions of officials of Army Ordnance. Prior to and on July 17, 1957, plaintiff Littlehale was employed by the United States Navy as an electronics engineer, GS–7, stationed at the United States Underwater Sound Laboratories, Fort Trumbull, New London, Connecticut, and was a resident and citizen of that State. Plaintiff Zelanko (at the time of commencement of this action a resident and citizen of the State of New York) was, prior to and on July 17, 1957, in the United States Navy with a rating of apprentice fireman and assigned as a cook aboard the SOMERSWORTH. On July 17, 1957, Littlehale was aboard the SOMERSWORTH in connection with a study concerning sound propagation tests being conducted by the United States Navy. In the course of such tests an explosion occurred aboard the SOMERSWORTH, inflicting serious injuries on plaintiffs herein. At that time the SOMERSWORTH was on the high seas, some 135 miles off Montauk Point, Long Island, New York.

The device which exploded was one of many similar devices being used in the tests and consisted, as noted, of three Du Pont blasting caps, fuse manufactured by the Ensign Bickford Company, and a TNT grenade, priming adapter and steel tubing or housing, each manufactured by an unknown company or person.[4] The blasting caps were manufactured by Du Pont on August 26, 1944, pursuant to contract number W–36–034–ORD–2115 with the United States of America (Ordnance Department of the War Department) and in accordance with the United States Government specifications set forth therein.

It is not disputed and I find that Du Pont fully complied with the specifications set by Ordnance, that the specifications required or contemplated no warning other than that required by the Interstate Commerce Commission regulations[5] (which were fully complied with) —the blasting caps being consigned to Ordnance which was expert in the use, handling and storage of explosives, including blasting caps. Ordnance was not at all interested in or desirous of receiving warnings from Du Pont because Ordnance and the Army, as part of their routine professional responsibility, thoroughly trained their personnel in the dangers and use of blasting caps, issued their own warnings of the caps' inherent dangers and regarded warnings by the manufacturer as superfluous. The whereabouts of the blasting caps after their sale to Ordnance by Du Pont until approximately 13 years later is unknown.

Plaintiffs have expressly abandoned any claim (a) that the blasting caps were manufactured without due care, without proper and adequate materials and not in accordance with proper design; (b) that the explosion in question was due to a defective blasting cap manufactured by

4. According to the affidavit of Littlehale, dated February 24, 1965, the explosive device which was used in making the tests consisted of a length of steel pipe, a wooden nose piece, a wooden tail piece with two sheet metal tail fins, a grenade, three blasting caps and two 75-inch lengths of fuse. The two 75-inch fuses were crimped onto two of the caps; one fuse and cap was placed in the detonator well of the grenade; the second fuse and cap assembly, together with an unfused cap, was placed on the outside of the grenade, and held in place with tape; then the grenade and attached caps were lowered into the steel pipe by the fuses. The fuses were then coiled up inside the pipe, after which the fuses were lit by a hot nichrome wire, the tail piece put on, and the device was thrown overboard. Plaintiffs were injured when the Navy man (not a plaintiff herein) to whom plaintiff Littlehale handed the device, lit the fuse, and, according to Littlehale, the device exploded instantaneously before it could be thrown overboard.

5. As to the effect of compliance or non-compliance with the Interstate Commerce Commission regulations, see Butler v. L. Sonneborn Sons, Inc., 296 F.2d 623, 626 (2d Cir. 1961); Garrett v. E. I. Du Pont De Nemours & Co., 257 F.2d 687, 688–90 (3d Cir. 1958).

Du Pont; and (c) that the cap was defective by reason of (i) the negligence of Du Pont in its manufacture and assembly; (ii) Du Pont's failure to use materials and devices which would prevent premature explosion so that the cap was latently defective; (iii) Du Pont's negligence in failing to make proper, sufficient and adequate inspection of the cap before distribution to users thereof; and/or (iv) other carelessness and negligence of Du Pont in the premises. It seems clear from the foregoing that the sole basis of plaintiffs' claim is the failure on the part of the manufacturer, Du Pont, to warn plaintiffs adequately of the inherent dangers to users of the blasting caps. These "inherent dangers" have been defined by plaintiffs as being

(a) that the ultimate user of said detonators (blasting caps) might well place said explosive detonators (blasting caps) where they might be exposed to excessive heat, impact, flame and sparks;

(b) that the fuse used with said explosives might be lit before sufficient stemming had been placed over the explosive to prevent sparks from coming into contact with the explosives or the caps;

(c) the dangers to the users of its detonators (blasting caps) which might result from stresses applied directly on the caps and fuse; and

■ (d) the dangers to the users of its detonators (blasting caps) from the results of minute damage to the covering of the fuse or caps. In short, plaintiffs allege that Du Pont was negligent in failing to provide warnings that the blasting cap would explode if exposed to heat, impact, flame, sparks, stresses or damage or if sparks from a fuse came in contact with it. It is not disputed that certain

warnings were printed on the boxes containing the blasting caps.[6] There is a dispute as to whether or not a particular and more detailed pamphlet was also contained in alternate boxes of 100 caps. However, the issue as to the sufficiency or existence of any warning is only relevant if a duty to warn plaintiffs existed on the part of Du Pont. Fully aware of the seriousness of the injuries claimed herein, I must hold that there was no such duty.

Federal jurisdiction is based on diversity of citizenship. At the time of the commencement of this action, plaintiff Littlehale was a citizen and resident of Connecticut, plaintiff Zelanko was a citizen and resident of New York, and defendant Du Pont was a corporation organized and existing under and by virtue of the laws of Delaware. Insofar as applicable substantive law is concerned, it might be observed that the contract for the manufacture of the blasting caps was prepared in Pennsylvania (although the place of execution is unknown); payment was to be made in Pennsylvania; the caps were manufactured in New Jersey and delivered f. o. b. there; the accident occurred on the high seas; and the forum is New York.

■ Were it not for the fact that a maritime tort is involved herein, the Court might well be bound to apply the substantive law of New York, the forum state.[7] However, the accident involved herein occurred on the high seas.

■ "Every species of tort, however occurring and whether on board a vessel or not, upon the high seas or navigable waters, the Supreme Court has said, is of admiralty cognizance. * * * '" 1 Benedict, Admiralty § 127 at 350, n. 1 (Knauth ed. 1940).[8] Accordingly, plain-

---

6. See Note 3, supra.

7. The substantive law of the forum state must be applied so long as the issues raised are not federal in nature. Similarly applicable are the conflict-of-laws rule and statute of limitations of the forum state. Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938);

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L. Ed. 2079 (1945).

8. It would appear that the wrongful act, if actionable, occurred on the high seas. The injury occurred aboard a vessel on

tiffs' claims are governed not by New York law, but by the general maritime law. Igneri v. Cie. de Transports Oceaniques, 323 F.2d 257, 259 (2d Cir. 1963), cert. denied, 376 U.S. 949, 84 S. Ct. 965, 11 L.Ed.2d 969 (1964); Kermarec v. Compagnia Generale Transatlantique, 358 U.S. 625, 628, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). Nor will the application of federal law depend upon whether the action was brought on the law side or the admiralty side of the court. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 409–410, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

▮▮ Is a claim based on failure to warn, as distinct from one based on breach of warranty, cognizable in admiralty?[9] As already noted, all claims of negligence or defects in manufacture have been abandoned by plaintiffs. However, the claim of negligence by failure to warn has not been abandoned.[10] Such a claim sounds in tort under the modern law of "products liability". The development of the liability of manufacturers and other suppliers has often been described "as the very model of the growth of a common-law institution."[11] Is it such a tort as is cognizable in admiralty? The fact that New York, the forum state, does or does not recognize "product liability" is, as indicated herein, not decisive.[12] However, "[m]aritime law draws on many sources; when there are no clear precedents in the law of the sea, admiralty judges often look to the law prevailing on the land." Igneri v. Cie. de Transports Oceaniques, supra, 323 F.2d at 259. If the "law prevailing on the land" recognized such a claim "uniformly or nearly so, a United States admiralty court would approach the problem hereby asking itself why it should not likewise do so; if the common law denied such a claim, uniformly or nearly so, the inquiry would be whether there was sufficient reason for an admiralty court's nevertheless recognizing one." (Id. at 260.)

▮ The liability of a manufacturer of explosives to third parties is widely recognized in this country.[13] No good reason exists why it should not be rec-

the high seas, and the explosion aboard that vessel was the last act necessary to make defendant liable if it had a duty to warn. The America, 34 F.Supp. 855 (E. D.N.Y.1940); see also Dencher v. Marlin Firearms Co., 198 F.2d 821, 823 (2d Cir. 1952) (dissenting opinion per Frank, J.); Abbott v. United States, 207 F.Supp. 468, 472 (S.D.N.Y.1962); Weinstein v. Eastern Air Lines, Inc., 316 F.2d 758, 765 (3d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 343, 11 L.Ed.2d 271 (1963); Patel Cotton Co. v. The Steel Traveler, 111 F.Supp. 821, 823 (S.D.N.Y.1953); Fortuna, 1965 A.M.C. 1765 (D.Mass. 3/31/65, per Sweeney, Ch. J.); McKee v. Brunswick Corp., 354 F.2d 577 (7th Cir. 1965).

9. If the action were for breach of implied warranty, the test for recognition of the action in admiralty would be the traditional requisites of an admiralty contract, i.e., was it an obligation maritime in its nature, for the performance of maritime service or transactions. Weinstein v. Eastern Air Lines, Inc., Note 8, supra, 316 F.2d at 766; Montgomery v. Goodyear Tire & Rubber Co., 231 F.Supp. 447, 453 (S.D.N.Y.1964). It seems difficult to conceive how a contract for blasting caps between defendant and Army Ordnance could be maritime in its nature, or for the performance of maritime service or transactions. However, the complaint is not founded on breach of warranty, express or implied.

10. I do not pass on whether the presently-defined "failure to warn" is encompassed by the allegations of the original complaint.

11. Ehrenzweig Products Liability in the Conflict of Laws—Toward a Theory of Enterprise Liability under "Foreseeable and Insurable Laws" Yale 69 L.J. 794 (1960).

Indeed, in a very recent case the rule of strict liability and the concept of "products liability" were applied in an admiralty suit. McKee v. Brunswick Corp., 354 F.2d 577 (7th Cir. 1965).

12. Pg. 10. The landmark case, of course, on the modern law of products liability, is MacPherson v. Buick Motor Company, 217 N.Y. 382, 111 N.E. 1050 (1916); Liberty Mutual Ins. Co. v. Hercules Powder Co., 224 F.2d 293, 295 (3d Cir. 1955).

13. Pg. 10. See, for example, Annot.—Liability of Manufacturer or Seller for Injury Caused by Firearms, Explosives and Flammables—80 A.L.R.2d 488 (1961).

ognized in admiralty in the field of maritime torts—indeed, defendant does not argue to the contrary.

However, in applying the law of product liability to the present case, certain facts must be borne in mind since they distinguish this case from the usual cases in this field:

1) The blasting caps were manufactured by defendant on August 26, 1944, in time of war, pursuant to a contract with the United States of America (Ordnance Department of the War Department) and in accordance with Government specifications set forth therein.

2) The blasting caps were not manufactured for re-sale, but for use by Ordnance.

3) Any claim that defendant was negligent in the manufacture, assembly, design or inspection of the caps or failed to use materials and devices which would prevent premature explosion has been withdrawn by plaintiffs.

4) The contract specifications were fully complied with and the blasting caps accepted by Ordnance.

5) The specifications required or contemplated no warning other than that required by the Interstate Commerce Commission regulations, which were fully complied with.

6) Ordnance was expert in the use, handling, and storage of explosives, including blasting caps, and thoroughly trained their personnel in the dangers and use of blasting caps, issued their own warnings of the caps' inherent dangers, and regarded warning by the manufacturer as superfluous.

Certain legal principles appear to be well settled in the field of product liability as applied to the foregoing facts which are not in dispute.

■ It seems clear that a manufacturer is under the duty to adequately warn a foreseeable purchaser or user of foreseeable and latent dangers upon proper and intended use of his product. Furthermore, the duty to warn may exist even though there is no defect in the product. See, e. g., Butler v. L. Sonneborn Sons, Inc., 296 F.2d 623, 625 (2d Cir. 1961); Tomao v. A. P. De Sanno & Son, Inc., 209 F.2d 544, 546 (3d Cir. 1954); Hentschel v. Baby Bathinette Corporation, 215 F.2d 102, 104 (2d Cir. 1954), cert. denied, 349 U.S. 923, 75 S. Ct. 663, 99 L.Ed. 1254 (1955).

■ However, a manufacturer of explosives is not absolutely liable as an insurer but is only required to exercise a reasonable degree of care commensurate with all the circumstances. Bernstein v. Remington Arms Co., 16 A.D.2d 694, 227 N.Y.S.2d 802 (2d Dep't 1962) (Mem.); Sierocinski v. E. I. Du Pont De Nemours & Co., 118 F.2d 531, 534 (3d Cir. 1941); McLamb v. E. I. Du Pont De Nemours & Co., 79 F.2d 966, 968 (4th Cir. 1935). "Even a munitions manufacturer cannot be held to a standard of conduct lying beyond the periphery of both the foreseeable and the ascertainable." Huffstutler v. Hercules Powder Co., 305 F.2d 292, 297 (5th Cir. 1962).

■ Moreover, there is ordinarily no duty to give warning to members of a profession against generally known risks. "There need be no warning to one in a particular trade or profession against a danger generally known to that trade or profession." 4 Shearman & Redfield, Negligence § 656 (Rev. ed. 1941); see Rosebrock v. General Elec. Co., 236 N. Y. 227, 237–238, 240–241, 140 N.E. 571, 574, 575 (1923); McDaniel v. Williams, 23 App.Div.2d 729, 257 N.Y.S.2d 702 (1st Dep't 1965); Parker v. State, 201 Misc. 416, 105 N.Y.S.2d 735, 741 (Ct.Cl. 1951), aff'd, 280 App.Div. 157, 112 N.Y. S.2d 695 (3d Dep't 1952); cf., Marker v. Universal Oil Prod. Co., 250 F.2d 603 (10th Cir. 1957); Kapp v. E. I. Du Pont De Nemours & Co., 57 F.Supp. 32 (E.D. Mich.1944); Morrocco v. Northwest Eng'r Co., 310 F.2d 809, 810 (6th Cir. 1962); Jamieson v. Woodward & Lothrop, 247 F.2d 23 (D.C.Cir.), cert. denied, 355 U.S. 855, 78 S.Ct. 84, 2 L.Ed. 63 (1957); Sawyer v. Pine Oil Sales Co., 155 F.2d 855 (5th Cir. 1946); Stottlemire v. Coward, 213 F.Supp. 897 (D.D.C. 1963).

■ If no warning is required to be given by the manufacturer to a purchaser who is well aware of the inherent dangers of the product, there is no duty on the part of the manufacturer to warn an employee of that purchaser. Marker v. Universal Oil Prod. Co., 250 F.2d 603 (10th Cir. 1957). In the last-cited case, an action for wrongful death, an oil company employee was asphyxiated by carbon monoxide gas when he was lowered into a petroleum refining vessel which had been constructed by the oil company pursuant to the defendant's design. At the time the vessel was in the process of being recharged with a hot catalyst furnished by the defendant. The court affirmed a directed verdict for the defendant, holding that Universal had no duty to warn the decedent of the danger of entering the vessel when hot catalyst was in use:

"The fact that the use of hot catalyst in the vessel during the process of recharging would create carbon monoxide gas and hence a dangerous condition for workmen lowered into the vessel was equally within the technical knowledge of both Universal and Tidewater [the decedent's employer-oil company]. No duty existed upon Universal to warn Tidewater of such a potentiality. * * * [Citing Section 388i of the Restatement of Torts—now Section 388k, Restatement Torts Second (1965)]

* * * [T]he obvious conclusion that arises [is] that defendant, knowing that Tidewater knew of the danger of using hot catalyst and would not be expected to abuse that knowledge, owed no duty to warn Tidewater employees * * *. [id. at 606]

* * * Under the circumstances of this case, it is beyond question that defendant owed to Tidewater no duty to instruct it as to fundamental formulae and the possibility of danger in the misuse of the polymerization unit and it had the right to rely upon Tidewater to protect its own employees from harm." (Id. at 607.)

In Hopkins v. E. I. Du Pont De Nemours & Co., 212 F.2d 623 (3d Cir.), cert. denied, 348 U.S. 872, 75 S.Ct. 108, 99 L.Ed. 686 (1954), it was held that where the blasting foreman had knowledge of the danger of premature explosion of dynamite placed in a newly-drilled hole before allowing heat caused by drilling to escape, and an employee working under the foreman was injured, the manufacturer of the dynamite was not negligent in failing to warn of such danger.

■ Furthermore, if the inherently dangerous product is manufactured for particular persons and purposes, any duty to warn would not extend to use by other persons for other purposes unless the manufacturer could reasonably have anticipated such other use for other purposes.

Harper v. Remington Arms Co., 156 Misc. 53, 280 N.Y.S. 862 (Sup.Ct.1935), aff'd without opinion, 248 App.Div. 713, 290 N.Y.S. 130 (1936), is clearly apposite to the issues involved herein. In that case, plaintiff had been given a box of shot-gun shells by a friend, who, in turn, had received them from an unidentified third person. The shells had been manufactured by defendant in a standard or usual size and type of cartridge, and were made exclusively for use in the testing of guns, being possessed of a greater explosive force than ordinary commercial shells. Plaintiff, who did not understand the printing on the shells or know of their extraordinary explosive force, loaded his gun with one which blew out the gun barrel, seriously injuring plaintiff. At the termination of plaintiff's case, defendant moved for dismissal on the ground that as a matter of law no liability on its part had been established. Decision was reserved, and the jury thereafter returned a verdict for plaintiff. The Court, after due deliberation, granted defendant's motion to dismiss.

"* * * These shells were identical in appearance and size with ordinary commercial shells, except that the words 'Proof-Load' were printed on

the sides and on the pasteboard insert in the open end of the shell were the words and figures 'Remington Proof 7.5 Tons Pressure.' The closed end of the shells bore the words and figures 'Rem.—Umc. Nitro Club No. 12.' The box which contained the shells had printed on the label affixed to the top of the cover the words and figures '12 Ga. Proof Loads loaded with Dupont Oval Powder to an average pressure of 7.5 tons. These shells must be kept in a cool place to avoid increases in pressure.' The box contained no other printing, wording, nor warning of any kind. [156 Misc. at 54, 280 N.Y.S. at 864].

\* \* \* \* \* \*

The defendant, in manufacturing these shells, created an active force, which, being of an intrinsically dangerous nature, created an active risk. Having created an active force or risk, it was incumbent upon the defendant to see that this active force or risk came to rest in a position of apparent safety, and the defendant was committed at that point to a duty of care to all those in the orbit of danger from the active force or risk created by it. The orbit of danger extended to protect only those who might reasonably have been anticipated by the normal prudent man to have been within that orbit. To all these persons the defendant owed a duty of due care. Genesee County Patrons Fire Relief Association v. L. Sonneborn Sons, 263 N.Y. 463, 189 N.E. 551; Smith v. Peerless Glass Co., 259 N.Y. 292, 181 N.E. 576; Palsgraf v. Long Island R. Co., supra; MacPherson v. Buick Motor Company, 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696, Ann.Cas.1916C, 440; Statler v. George A. Ray Mfg. Co., 195 N.Y. 478, 88 N.E. 1063; Thomas v. Winchester, 6 N.Y. 397, 57 Am.Dec. 455. The intrinsically dangerous nature of the shells required that notice be given by the defendant to all those who reasonably could have been anticipated to use the shells in their ordinary and expected manner of their unusual ex-

plosive force if the defendant was to comply with the necessary measure of due care required of it (Thomas v. Winchester, supra; Genesee County Patrons Fire Relief Association v. L. Sonneborn Sons, supra), or circumstances must have existed which would have made the giving of such warning unnecessary. Rosebrock v. General Electric Co., 236 N.Y. 227, 140 N.E. 571. In the case at bar, the defendant, in manufacturing these shells for particular persons and purposes, owed a duty of due care to all such persons it could reasonably expect to use the shells or come in contact with them, but to no others. This viewpoint has been adopted by the American Law Institute in the Restatement of the Law of Torts, § 388:

'One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

'(a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied;

'(b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and

'(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so.'

In the instant case, the defendant was duty bound to see that the class for whom these shells was intended or into whose hands they might reasonably pass had knowledge of their dangerous character. To those persons the defendant owed the duty of giving notice and warning, and an omission to give it would have been negligence.

The defendant could have been relieved from this duty of giving notice if knowledge of the dangerous character of these shells was had by the vendees. Rosebrock v. General Electric Co., supra; Sagler v. Kellogg Steamship Corp., 155 Misc. 217, 277 N.Y.S. 792. [156 Misc. at 56–57, 280 N.Y.S. at 867–868.]

\* \* \* \* \* \*

The plaintiff herein was not within the orbit of danger. The plaintiff failed to show that he was a person whom the defendant might reasonably have anticipated would use these shells. Neither has the plaintiff shown that the shells were put to a use which the defendant had reason to expect they would be put. The law is well settled that when a vendee at the time of delivery knows by reason of the custom of the trade or otherwise of the dangerous nature of an article purchased, the vendor is relieved from liability for injury to third persons. Rosebrock v. General Electric Co., supra." (156 Misc. at 58, 280 N.Y.S. at 868.)

▮▮▮▮ In the instant case, as in Harper, the product was manufactured for a particular user—in this case for Ordnance or (as indicated on the boxes) the "Corps of Engineers". They were identified as "Special Blasting Caps"; in Harper they were identified as "Proof Loads". In fact, the warnings on the cap boxes in the instant case would appear to be more informative than those contained on the shells in Harper. Furthermore, in Harper the Court showed no hesitation in granting defendant's motion to dismiss even though the jury had rendered a verdict in favor of plaintiff.[14] In the instant case, as in Harper, plaintiffs are outside the "orbit of danger". There is no dispute as to the identity of the intended and actual purchaser, nor as to the familiarity of such purchaser with the proper use of and inherent dangers of blasting caps. Absent such dispute, it is the duty of the Court, as a matter of law, to define the "orbit of danger" and the existence or non-existence of duty on the part of the manufacturer to the particular plaintiffs involved. The authorities hereinbefore cited clearly exclude plaintiffs from the "orbit of danger" and absolve defendant of any duty to them.

▮▮▮▮ In considering the applicable law, it is at least helpful to recognize this case for what it is not. It is not a case involving a product manufactured for sale or resale to the general public.[15] It is not a case involving negligence in the manufacture, design or use of ma-

---

14. I am not convinced that every case involving "foreseeability" presents a jury question, particularly where no evidence to support the foreseeability of the particular use or user to be foreseen has been presented. Certainly judges should not be relieved of the unpleasant duty to non-suit where a justiciable issue, as distinguished from an invitation to pure conjecture, has not been presented. If this is not true, it seems difficult to reconcile cases where a jury verdict has been set aside as a matter of law.

"\* \* \* [J]ust as there are some cases in which the court is justified in directing a verdict. or granting judgment notwithstanding the verdict in negligence cases [citing cases] so also there have been some cases in which it has been held proper to grant summary judgment on issues of negligence. [Citing cases.]" 3 Barron & Holtzoff, Federal Practice & Procedure § 1232.1 at 110 (1958). See Note 2, supra; Davis v. Henderlong Lumber Co., 221 F.Supp. 129, 135 (N.D.Ind. 1963), and cases cited therein.

15. It also should be borne in mind that the caps were manufactured during wartime; and one can surmise that they were intended for use during that period.

It could scarcely be argued that a soldier serving in the Corps of Engineers in wartime could maintain a suit against the manufacturer for failing to warn him against dangers inherent in the use of non-defective blasting caps. The implication of liability of munitions or weapons manufacturers to members of the Armed Forces in time of war for failure to instruct or warn as to the proper usage or inherent risks involved, particularly where such munitions or weapons are manufactured in accordance with Government specifications for use by the Corps of Engineers (experts in the field of explosives) presents questions of public policy, which, fortunately, it is not necessary to reach herein.

terials. It is not a case where the manufacturer had any freedom of choice as to manufacture, design, or use of materials. It is not a case where evidence has been submitted upon which foreseeability of the particular use involved herein could be predicated. It is not a case involving a product such as a heating brick, paint, agricultural or horticultural germicide or similar product, or other material which, while inherently dangerous in connection with certain use, is not generally known to be so. It is a case where the product was manufactured during wartime in accordance with detailed specifications [16] for use by a particular branch of the

16. As heretofore indicated, it is not disputed that the caps were manufactured (including the warnings placed thereon) in strict accord with the contrast specifications and Interstate Commerce Commission regulations, and were accepted by Ordnance.

In Ryan v. Feeney & Sheehan Bldg. Co., 239 N.Y. 43, 145 N.E. 321, 41 A.L.R. 1 (1924), the defendant constructed a building and canopy, fully complying with plans and detailed specifications furnished to it by the United States Government.

The Court held that "[a] builder or contractor is justified in relying upon the plans and specifications which he has contracted to follow, unless they are so apparently defective that an ordinary builder of ordinary prudence would be put upon notice that the work was dangerous and likely to cause injury." 239 N.Y. at 46, 145 N.E. at 321.

The rule was restated in Person v. Cauldwell-Wingate Co., 187 F.2d 832, 836 (2d Cir.), cert. denied, 341 U.S. 936, 71 S.Ct. 855, 95 L.Ed. 1364 (1951), wherein the Court stated that there was no evidence that rigging, done according to Government specifications, was "'obviously' or 'glaringly' dangerous. * * * [a finding which is] a condition [precedent to] * * * a contractor's liability." Similar statements are found in the Court's prior decision wherein it was observed that there would be no liability if the plans "were not so patently dangerous that competent electrical engineers would have thought them improper." Person v. Cauldwell-Wingate Co., 176 F. 2d 237, 241 (2d Cir.), cert. denied, 338 U.S. 886, 70 S.Ct. 189, 94 L.Ed. 544 (1949).

The within concept of contract specification defense, though interrelated with the Government contract defense (Note 17, infra), is equally applicable where a private party contracts for a product to be manufactured or building to be done, and sets forth detailed specifications for the building and/or manufacture.

Davis v. Henderlong Lumber Co., 221 F.Supp. 121 (N.D.Ind.1963) was a case of construction and installation of a chemical fume hood and exhaust apparatus, manufactured and installed in accordance with plans supplied by plaintiff's employer who accepted the work done and took possession of the plant.

The Court, after noting that despite the extension of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916), one limitation still remained with respect to the liability of independent contractors, cited Ryan, supra, with approval and stated that the plans were not "so obviously or glaringly dangerous that a contractor * * * would not have attempted the construction and installation according to the plans and directions * * *." 221 F.Supp. at 134. See Leininger v. Stearns-Roger Mfg. Co., 17 Utah 2d 37, 404 P.2d 33 (1965).

In the "typical" products liability case, the manufacturer of the product, having the sole decision as to the method and means of manufacture and all other details, is in reason the party to be charged since it is his act or failure to act which was the proximate cause of the accident. The case at bar, however, presents a different picture since here an independent contractor having no discretion or control over production and means of manufacture is directed to comply with the strict contract requirements and specifications contained therein. It is in that situation that the "independent contractor" exception is applicable, relieving the independent contractor of liability if he follows plans which are not so glaringly or patently insufficient that an ordinary prudent manufacturer would not follow them.

Indeed, one Court has gone so far as to absolve the contractor, following plans, of responsibility without even appending the "glaring and obvious" limitation.

"When the work has been performed in accordance with plans and specifications furnished by the owner which the contractor is bound to follow and the completed work has been accepted by the owner, the contractor is not liable to a third person for injuries resulting from a structural defect. [Space between a seat board and back rest on a grandstand] * * * [T]he injury-causing defect is in the plans and specifications and not the result of negligence on the part of the

Government, namely, Ordnance (or the Corps of Engineers as indicated on the containers); the user was as well or more fully informed of the hazards involved and the correct methods of use as was the manufacturer; the product, if not used by the originally intended user, was nevertheless used by an employee of the Government—i. e., a civilian employee of the Navy; and no evidence has been offered upon which a jury could find that the particular use (or user) involved herein was foreseeable by the manufacturer. If the duty to warn did not exist as between the manufacturer and the ultimate intended purchaser at time of sale, such a duty cannot arise at some later date by reason of some unforeseeable disposition of the product by such initial purchaser. We are not, as

suggested by plaintiffs, dealing with a contract by which both parties to that contract are attempting to relieve themselves of all liability arising out of the use of such product by third parties (assuming that use by Navy employees can be considered as use by other than the Government). The sole question is the liability of defendant herein, not the liability of the Government, or others not parties hereto.

■ Touching briefly upon another point raised by defendant—namely, that a Government contract is involved herein, with the specifications set out in detail by the Government so that, in effect, defendant constituted a subcontractor of Government—while such defense may have merit,[17] I prefer to base the

---

contractor." Barnthouse v. California Steel Bldgs. Co., 215 Cal.App.2d 72, 29 Cal.Rpt'r 835, 836 (Dist.Ct.App.1963).

In any event, it appears that the *Mac-Pherson* rule is limited in cases where a manufactured product is manufactured in accordance with plans and specifications of one other than the manufacturer—in those cases liability falls on the manufacturer (as opposed to the one supplying the plans), and his duty comes into being only when the plans are so "obviously, patently or glaringly" dangerous that an ordinary manufacturer would not follow them.

Thus it seems that the duty imposed in these situations is somewhat less than the duty imposed where the manufacturer does the work as he desires, not being bound by specifications of another. For if the duty where he has control were the same as the duty where he is controlled by another, the general ordinary prudent man test would be applicable without the limitation imposed by the "glaring, obvious or patent" adjectives which appear to lessen his duty and impose liability on the manufacturer in only the extreme case.

In the case at bar, since I have held that no duty at all was breached in the failure to warn, a *fortiori*, the following of plans which precluded further warning was not a patently or glaringly dangerous act. For in this case the test applied to find no liability was whether an ordinary prudent manufacturer would have acted in this manner, which, of necessity, encompasses the question of whether the plans

were so glaringly insufficient that an ordinary prudent manufacturer would not have followed them.

This, of course, in no way absolves the party from whom the product was manufactured and whose plans were followed from liability; it merely shifts the area of inquiry to the party who should more properly be held to answer for the wrong done either by reason of its failure to require or specify a further warning in the contract, or by reason of its failure at a later date to train its personnel and/or provide further warnings when the product came (if that be the case) into the hands of less experienced persons. See generally, Wenniger v. United States, 234 F.Supp. 499, 505 (D.Del.1964), aff'd, 352 F.2d 523 (3d Cir.1965) (Per curiam); Brown v. United States, 193 F.Supp. 692 (N.D.Fla.1961).

By reason of the finding of no negligence or breach of duty herein, Montgomery v. Goodyear Tire & Rubber Co., 221 F.Supp. 447 (S.D.N.Y.1964) is inapposite. In that case it was alleged that the plans were followed in a negligent and improper manner.

17. It appears that such a defense, absolving the manufacturer of all responsibility, would arise only if the Government itself were held to be immune from liability.

"The piping of the dredges was pursuant to a validly conferred authority under a contract. The question of foreseeability of harm and the possible need to protect against it arose when the Government framed its terms. There is no charge that what the contractor did was not what

decision reached herein on the doctrine set forth hereinbefore in Harper v. Remington Arms Co., supra.

 Likewise, although I believe that any statute of limitations would run from the date of injury rather than the date of sale, defendant's assertion that suit based on the present claim of failure to warn is time-barred may be a valid one, since the inherent risk as to which plaintiffs now claim warning should have been given is clearly different from the risk originally alleged and plaintiff has submitted uncontroverted proof of prejudice by the "amendment". However, as already noted, if no duty on the part of defendant to warn plaintiffs existed, application of any statute of limitations, or more particularly the doctrine of laches, is academic.

As for plaintiff Zelanko, if a duty on the part of defendant to warn Littlehale existed, Zelanko was within the orbit of those entitled to recover for a breach of that duty. Since the Court finds that no such duty existed, recovery by Zelanko against defendant is likewise foreclosed.

Accordingly, defendant's motion for summary judgment is granted.

So ordered.

---

it was required to do. Rather, it is that it was negligent in failing to provide some safeguard against the subsequent escape of the fumes. Yet, as stated above, this was a decision which rested with the Government. The Government did not provide for such additional precautions in the plans, and the Western Contracting Corp. is not to be held liable for this omission." Dolphin Gardens, Inc. v. United States, 243 F.Supp. 824, 827 (D.Conn.1965) ; see Myers v. United States, 323 F.2d 580 (9th Cir.1963) ; Merritt Chapman & Scott Corp. v. Guy F. Atkinson Co., 295 F.2d 14 (9th Cir.1961) (wherein the defense was inapplicable because the terms of the contract did not require the defendants to do that which was charged against them as negligent acts, the contract leaving to their discretion both the construction and maintenance of the cofferdam). See also, Yearsley v. W. A. Ross Constr. Co., 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940).

Considerations similar to those set forth in Note 16, supra, make Montgomery v. Goodyear Tire & Rubber Co., supra, inapposite herein as well.

The sum total of Notes 16 and 17 is that where a party contracts with the Government and the Government specifies the means by which the product is to be manufactured and other details incident to the production, the manufacturer's acts in accordance with the plans are at the very least not measurable by the same tests applicable to a manufacturer having sole discretion over the method of manufacture, and at the most are insulated from any liability. However, I have chosen neither alternative as the basis for my decision herein since I have measured Du Pont's actions by the generally applicable standard of conduct.