### PERSON v. CAULDWELL-WINGATE CO. et al.
### No. 250, Docket 21311.

United States Court of Appeals
Second Circuit.

Argued May 6, 1949.

Decided July 5, 1949.
Writ of Certiorari Denied Nov. 21, 1949.
See 70 S.Ct. 189.

238

Before L. HAND, Chief Judge, and AUGUSTUS N. HAND and FRANK, Circuit Judges.

Louis A. D'Agosto, New York City, for appellant.

John F. X. McGohey, U. S. Atty., New York City (Louis Mansdorf, Asst. U. S. Atty., New York City, of counsel), for Cauldwell-Wingate Co. and another.

Robert R. Rosan, Port Chester, N. Y., for Portchester Electrical Construction Co.

L. HAND, Chief Judge.

The plaintiff, who is administratrix of her husband, William S. Person, has appealed from a judgment, dismissing her complaint to recover damages for the death of the intestate through the negligence of the three defendants. The decedent was an electrical linesman in the employ of other persons and was killed on August 6, 1946, while at work in an army camp in the County of Rockland, New York. The jurisdiction of the court depends upon diversity of citizenship. Since at the close of the plaintiff's case the judge dismissed the complaint because the evidence would not support a verdict, it will be necessary to state the facts in some detail. Person was killed after he had climbed to the upper part of "Pole 1422," where he was about to "tap" in a service wire. While in position on the pole he took hold of the upper one of two "guy" wires which led from the pole to the ground, and which had been set up to support the pole against lateral thrusts. This wire chanced to be in electrical contact with a main transmission wire carrying a high voltage, and the current passed through Person's body to the ground, killing him instantly. In 1942 the War Department had awarded a contract to the defendants, Cauldwell-Wingate Company and the Poirier & McLane Company, for the construction of the camp, and these companies—which we shall speak of together as the Contractors—had let out the stringing of the high tension wires throughout the camp to the defendant, Portchester Company, which we shall call the Sub-Contractor. A local company had furnished and set in place "Pole 1422" before the work began, and on March 18, 1943, the Sub-Contractor strung one high tension wire to one side of the pole and fastened it in place with proper insulation. It then strung another such wire away from the other side of the pole, to which it was similarly fastened and insulated. In order to complete the electrical connection between these two sections of high tension wire, the Sub-Contractor then passed a section of bare wire, called a "jumper," around the pole and fastened one end to one section of the high tension wire, and the other end to the other section, allowing enough slack in the "jumper" not to touch the pole. Whether because of the axial turning in the wind of the high tension wires, or because the "jumper" sagged down of itself, it came into con-

tact with the top of a metal plate which fastened the end of the upper "guy" wire to the pole. Although the lower end of this "guy" wire was insulated, when Person took hold of it near the plate he completed a circuit to the ground. There was testimony which would have supported a verdict that such an installation of the "jumper" was negligent construction, if the upper "guy" wire was in place when the Sub-Contracter installed the "jumper"; and we think that it was also negligent, if the upper "guy" wire was set up between March 18 and May 15, when it delivered the work to the Contractors or to the Army authorities, for it was charged with a duty to inspect the work for any changes which might have been made until it surrendered control.

Although the evidence is not indubitable that the upper "guy" wire had been set in place before May 15, 1943, it seems to us that the plaintiff did make out a case on that issue which should have been submitted to the jury. Burton, an electrician foreman employed by the War Department, testified that he began to work at the camp in August, 1943; and that from the time he arrived until Person's death, no change had been made on "Pole 1422." Therefore, unless the upper of the two "guy" wires was put in place between May 15, 1943, and August 31, 1943, the evidence was sufficient to support a verdict against the Sub-Contractor. Moreover, this period may be further reduced to the two months of July and August. "At the end of the job between June and July" six persons made a survey of the whole work done by the Sub-Contractor for the purpose of determining what it had earned under its contract, for it was to be paid "on a unit price basis." These six were two engineers of the Contractors, one of the Sub-Contractor, "a representative of the Army" and two others whose principals are not disclosed. They went "from pole to pole to determine how many different objects were attached to the various poles," and it is certainly a reasonable inference that they had with them Exhibit 4, which

was a map of "the job as it was when it was completed." It is dated June 30, 1943, and "Pole 1422" appears on it as an "existing pole," which accords with the testimony that it had been set up by the local company before the Sub-Contractor began any work. Moreover, the symbols upon the map indicate that the Sub-Contractor had not set up any "down guys" on that pole, although it was so situated that one such "guy" would certainly have been needed, and more probably two. Indeed, the president of the Sub-Contractor had a faint recollection that one had been set up, although not by his company.

■ Thus, the only hiatus in the plaintiff's evidence is that she failed to prove that someone had not set up the upper "guy" wire on "Pole No. 1422" between July 1st and—at the latest—August 31st. That, it must be confessed, is a possibility, but it seems to us to be improbable enough to sustain a finding by a jury that the wire was not set up during that period. The work had just been turned over to the Army, whose engineer had made a detailed inspection which satisfied him. The alternative to supposing the upper "guy" wire was then in place is to suppose that later an Army engineer thought the support of that pole insufficient, and set up the upper wire. It was improbable that the same engineer who had originally passed the installation should have changed his mind; and it is also improbable that, during those two months, it should have been thought necessary to direct another engineer to make a second "pole by pole" examination in detail, and to conclude that the first engineer had been mistaken. For these reasons we hold that the evidence permitted the jury to find that the upper "guy" wire was in place when the Sub-Contractor installed the "jumper."

■ The Contractors claim immunity from any negligence of the Sub-Contractor under the doctrine that an owner or a contractor, who has employed a competent sub-contractor, is not liable for his defaults.[1] That is the law of New York[2] as

1 Restatement of Torts, § 409.
2 Hexamer v. Webb, 101 N.Y. 377, 4 N.

E. 755, 54 Am.Rep. 703; French v. Vix, 143 N.Y. 90, 37 N.E. 612; Moore v.

elsewhere; and, as elsewhere, it is subject to exceptions, one of which is that when the owner or contractor exercises supervision over the sub-contractor's performance, he is liable.[3] We can find no evidence in the record that in the case at bar the Contractors did exercise supervision over the performance of the Sub-Contractor; and we reject this as a ground for holding them. Indeed, the plaintiff suggests the contrary with little conviction. What she particularly invokes is another exception, which is that the owner or contractor is under a duty to supervise his sub-contractor's performance, although he may not have voluntarily assumed it, if the work is "inherently dangerous;[4] and there can be no question that a jury would be justified in finding that the rigging of a "jumper" so near an upper "guy" wire, fell within that phrase. In such cases the law imposes the duty of inspection upon the owner or contractor in invitum, and forbids him to delegate it, just as it does when a statute or an ordinance directly imposes such a duty.[5] Often the factor which appears particularly to determine "the inherent danger" is the proximity of the work to a highway, since it is then more likely that any mischance will do harm, but these are merely instances of the general doctrine. Nor are the decisions anomalous which hold that the duty to inspect upon such occasions does not extend to matters "collateral" to the work itself.[6] These do not concern the existence of the duty to inspect, but the extent of the inspection required. They only mean that the owner or the contractor need not follow the progress of the work in the details of its execution. For the foregoing reasons we hold that, if the jury found the Sub-Contractor liable, it might also find the Contractor liable.

We have assumed hitherto that the occasion at bar should be judged by decisions in which the injury happened during the progress of the work, and not, as here, after it had been turned over to the owner. That appears to us an altogether proper step to take. Certainly it is true that the same duty towards a "business visitor" which is imposed upon the owner of land is imposed upon an electrical company which has erected and is maintaining a defective electrical system over land upon which the injured person is a "business visitor."[7] Moreover, in Wilks v. New York Telephone Co.,[8] the same liability was imposed upon a constructing company which at the time of the injury had turned over the defective system to another company. The facts in the case were strikingly like those at bar. One of the defendants, the Federal Company, had installed a dangerous wiring system upon its own property, which it had later conveyed to the other defendant, the New York Telephone Company. The United States took over the property during the war, and on that account the Court of

Charles T. Wills, Inc., 250 N.Y. 426, 165 N.E. 835.

[3] De Lee v. T. L. Pardy Construction Co., 249 N.Y. 103, 162 N.E. 599; Rosenberg v. Schwartz, 260 N.Y. 162, 183 N. E. 282; Hanley v. Central Savings Bank, 255 App.Div. 542, 8 N.Y.S.2d 371, affirmed 280 N.Y. 734, 21 N.E.2d 513.

[4] Engel v. Eureka Club, 137 N.Y. 100, 104, 105, 32 N.E. 1052, 33 Am.St.Rep. 692; Paltey v. Egan, 200 N.Y. 83, 91, 93 N.E. 267; Hyman v. Barrett, 224 N.Y. 436, 439, 121 N.E. 271; Besner v. Central Trust Co., 230 N.Y. 357, 130 N.E. 577, 23 A.L.R. 1081; Boylhart v. Di Marco & Reimann, Inc., 270 N.Y. 217, 200 N.E. 793; Rohlfs v. Weil, 271 N.Y. 444, 3 N.E.2d 588; Wright v. Tudor City Twelfth Unit, Inc., 276 N.Y. 303, 12 N. E.2d 307, 115 A.L.R. 962; Schwartz v. Merola Bros. Construction Corp., 290 N.

Y. 145, 152, 48 N.E.2d 299; Restatement of Torts, § 416.

[5] Walters v. Rao Electrical Co., 289 N. Y. 57, 43 N.E.2d 810, 143 A.L.R. 308; Semanchuck v. Fifth Ave. & 37 St. Corp., 290 N.Y. 412, 49 N.E.2d 507; Restatement of Torts, § 424.

[6] Hyman v. Barrett, 224 N.Y. 436, 121 N.E. 271.

[7] Braun v. Buffalo General-Electric Co., 200 N.Y. 484, 94 N.E. 206, 34 L.R. A.,N.S., 1089, 140 Am.St.Rep. 645, 21 Ann.Cas. 370; Burrows v. Livingston-Niagara Power Co., 217 App.Div. 206, 216 N.Y.S. 516, affirmed 244 N.Y. 548, 155 N.E. 892; Van Leet v. Kilmer, 252 N.Y. 454, 169 N.E. 644; Buell v. Utica Gas & Electric Co., 259 N.Y. 443, 182 N. E. 77.

[8] 243 N.Y. 351, 153 N.E. 444.

Appeals exonerated the New York Telephone Company from liability for a death caused by the defective system. However, it held the Federal Company because, "if the evidence sustains the charge that the defendant Federal Company did erect the wire in such manner as to make it a menace to others, the verdict against it must be sustained." 243 N.Y. at page 362, 153 N.E. at page 447. The fact that the court called the wiring a "nuisance" is not important in this connection. Coleman v. A. L. Guidone & Sons, Inc.,[9] is not to the contrary. The defendant had built temporary steps which were proper at the time, but which after they had been turned over had become unsafe. Indeed, the opinion ends with the caveat that in case the defendant "had put into them a rotten board, the rule might be different." The liability in such cases is in principle that which is imposed upon a manufacturer who puts in general circulation—so to say—a thing which, if improperly constructed, is likely to cause injury to others. He is charged with reasonable care in the circumstances to see that it is properly constructed. As to things which, like the rigging of "Pole 1422" were "inherently dangerous," or could be found so, there has never been doubt about this since Thomas v. Winchester;[10] and, if there still persist any doubts[11] that after MacPherson v. Buick Motor Co.,[12] the liability is not limited to "inherently dangerous" things, we need not be concerned to answer them. They do not exist in New York; and if they did, they would not protect the defendants here.

■ Apparently as an independent point the defendants argue that in any event the rigging on "Pole No. 1422" was not the "proximate cause" of Person's death. If by this they mean that it was not to be reasonably apprehended that a linesman might in the future have to tap a wire from the main wire, that in so doing he might seize the upper "guy" wire, and that meanwhile the "jumper" might have swung into electrical contact with that wire, the probability of this was so plainly a question for the jury that we need not discuss it. If, on the other hand, they mean that it was a fault of the War Department not to discover and correct the defect and that because that fault intervened after the defendant's fault, it "broke the causal chain," the argument is unsound; for it is not the law of New York that the intervention of a succeeding fault as such gives immunity to an earlier wrongdoer.[13] The presence of the second wrongful act in the chain of circumstances which leads from the wrongful act to the injury is legally irrelevant, unless its occurrence is so unexpected that the injury is not to be a reasonably foreseeable result of the first act. That question must be determined as though the second act were itself innocent. In the case at bar the fault of the War Department, if it was a fault, is relevant only in that sense; it did not insulate the defendants from liability.

■ Finally, the defendants argue that. since the work was done according to the plans and specifications of the War Department, they may not be held liable provided they did the work as therein prescribed.[14] That is an issue on which we shall not pass now. It was a defence which the defendants had the burden of proving; the negative was no part of the plaintiff's case, and indeed the plans and specifications were not even put in evidence. If they had been, the defendants would have been obliged, not only to satisfy the jury that they required the rigging at "Pole 1422" to be as it was, but that the specifications were not so patently dangerous that competent electrical engineers would have thought them improper. These issues will be open on the new trial.

Judgment reversed; cause remanded for a new trial in accordance with the foregoing.

9 192 App.Div. 120, 182 N.Y.S. 625, 627.

10 6 N.Y. 397, 57 Am.Dec. 455.

11 Ford v. Sturgis, 56 App.D.C. 361, 14 F.2d 253, 52 A.L.R. 619.

12 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696, Ann.Cas.1916C, 440.

13 Carlock v. Westchester Lighting Co., 268 N.Y. 345, 197 N.E. 306.

14 Hardie v. Charles P. Boland Co., 205 N.Y. 336, 98 N.E. 661; Ryan v. Feeney & Sheehan Building Co., 239 N.Y. 43, 145 N.E. 321, 41 A.L.R. 1.