**PERSON v. CAULDWELL–WINGATE CO., Inc., et al.**

**No. 183, Docket 21900.**

United States Court of Appeals
Second Circuit.

Argued Feb. 8, 1951.

Decided March 14, 1951.

Herbert S. Greenberg, New York City, Monroe J. Cahn, White Plains, N. Y., for Cauldwell-Wingate Co. and Poirier & McLane Corp.

Robert R. Rosan, Port Chester, N. Y., and Walter G. Evans, New York City, for Port Chester Electrical Const. Corp.

Louis A. D'Agosto, New York City, for appellee.

Before L. HAND, SWAN and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The defendants appeal from a judgment, entered upon the verdict of a jury after a trial of the action which was before us in Person v. Cauldwell-Wingate Company, Inc., 2 Cir., 176 F.2d 237. Upon the first trial the judge had dismissed the complaint when the plaintiff rested on the ground that she had not made out a case; but we reversed because we thought that the evidence unanswered would have supported a verdict. Upon the second trial the plaintiff's evidence was substantially the same; but the defendants put in evidence which we shall mention in a moment. The principal questions now raised are, once more, whether the evidence supported a verdict, and next, whether the judge's

charge was wrong. In what we say we shall assume an acquaintance with what appears in our first opinion. Upon this trial the defendants proved that the "jumper" which connected the two high tension wires, when it was originally installed, was not itself a separate piece of wire, as the evidence on the first trial showed, but was the continuation of one of the high tension wires, which, after passing through the "clevis" of one insulator bell, had been twisted on itself, and the free end carried around the pole, six to ten inches away from it, and made fast to the other high tension wire by a "Burndy connector." In short, the original "jumper" had not been a separate wire, but the end of one of the high tension wires. The jury was justified in inferring from this substitution that the high tension wire, of which the "jumper" was formed, had sagged between poles and had been pulled taut; and that the end had been cut off and a new "jumper" substituted, fastened at each end by a "Burndy connector." The record does not indeed contain any evidence that this had been true of that particular high tension wire; but it does contain evidence that such pulling had been done in the neighborhood, and that confirms the explanation which we have suggested. On the other hand, documentary evidence proved, in a way that no jury was justified in disregarding, that Burton, the plaintiff's best witness, had not been on the job until November, 1943, so that the interval between May 15 and the time when he could have seen Pole No. 1422 was about six months instead of three and a half. The length of that interval was important upon the first trial only upon the issue whether the upper guy wire was in place before the subcontractor left the job and, as neither defendant raises that question upon this appeal, the new evidence was not important.

First, as to the sufficiency of the evidence as a whole. On the first appeal the defendants had not put in evidence the plans and specifications which the Army officers in charge of the work furnished to the contractor and on which the subcontractor did the work. These were put in upon the second trial; and the plaintiff argues that they show that the high tension wire should have been carried over Pole No. 1422 by one or two "pins," fixed in the top of the pole and carrying insulators. That is certainly not true; all that the specifications required, or indeed that the plaintiff's own electrical expert said, was that, if the angle beyond the wire on one side of a pole was less than twelve degrees, one such "pin" might be used; and, if the angle was less than twenty-four degrees, two might be used. It was only when the angle was more than twenty-four degrees that the construction should be adopted on Pole No. 1422. Therefore the most that the evidence warranted a jury in finding was that Pole No. 1422 could have been properly rigged on one or two "pins"; not that it should have been. The plans and specifications contained no direction as to how the pole in question should be rigged; and the defendants did not rely upon them. They did, however, put in testimony that all the work was done under the immediate personal direction of an Army officer in general charge of the construction; and his orders, they insisted, excused any defects in construction. We regret that the judge did not take a special verdict on that issue, for the jury may not have believed the testimony; but in its absence we are obliged to dispose of the appeal on the assumption that they did believe it. Thus it raised the principal question: whether the defendants might safely rely upon the instructions given them, or whether they were to any degree responsible for the safety of the construction, and, if so, how far. The question of the sufficiency of the evidence upon this issue coalesces with that of the correctness of the judge's charge.

A crucial passage of his instructions was the following: " 'Would competent electrical engineers have anticipated that the jumper thus installed might have touched the strain plate and would they have anticipated that a lineman climbing the pole might have touched the guy wire thus energized?' If you conclude that they would, then you have patent danger. If you decide that competent electrical en-

gineers would have foreseen these contingencies, then you must answer the question 'Were the defendants negligent?' in the affirmative, notwithstanding that you may find that the defendants installed the jumper in that manner pursuant to the directions of the Army engineers." This put the case before them in substantially the words which we had used in our former opinion as a direction upon a new trial; but the defendants insist that to set the standard of a "competent electrical engineer" did not conform to the law, as the New York courts have laid it down; and since this is a case in which the jurisdiction of the district court depended upon diversity of citizenship, the New York decisions are authoritative. The controlling decisions are two: Hardie v. Charles P. Boland Co.[1] and Ryan v. Feeney & Sheehan Building Co.[2] So far as anyone has found, the point has not been ruled in that court since 1924; and since then the only decision in any of the Appellate Divisions, even remotely in point, does not add anything to the doctrine as it had been enunciated.[3] Hardie v. Charles P. Boland Co., supra, came up upon appeal from a judgment entered upon the verdict of a jury in an action by an employee against his employer to recover for personal injuries caused by the fall of a chimney on which he was at work. The employer was a contractor, engaged in putting up a building in accordance with plans prepared by owner's architect. The plaintiff had invoked the doctrine of *res ipsa loquitur* with the usual result that everybody became confused, and the Court of Appeals thought that the confusion had so far invaded the trial that the judgment could not stand. The trial court had, however, charged the jury as to the extent to which the defendant was justified in relying upon plans of the architect, in language which "stated the correct rule for such a case such as this," 205 N.Y. at page 342, 98 N.E. at page 663; and which would have resulted in affirmance save for the confusion we have mentioned. These were the words approved:

"The contractor is presumed to know his business. But unless the defect was such a defect as he ought to have realized and known about it, which he ought to have anticipated and thus have avoided the injury, then there is no negligence even though the chimney fell. Upon that question you may consider the fact that this building was being erected upon plans that had been furnished by another * * *. With those plans * * * ought the defendant to have realized that that was a dangerous construction?" The opinion of the Court of Appeals had already said that the plan was a protection to the contractor unless the plaintiff had shown in addition that it "was so obviously defective that a contractor of average skill and ordinary prudence would not have attempted the construction according to the plan," 205 N.Y. at page 340, 98 N.E. at page 663, and that standard the court expressly accepted in Ryan v. Feeney & Sheehan Building Co., supra.[4] That case arose upon an appeal from a judgment dismissing the complaint without taking a verdict. The defendant was also a contractor putting up a building in accordance with plans and specifications, furnished, as in the case at bar, by the United States Army. The plaintiff had called a witness, apparently an architect, who swore that it was "obvious, looking at the plan," that that part of the building was "improperly constructed." This testimony the court held was not enough to carry the case to the jury; the contractor "was justified in relying upon the experience and skill of the architect and supervising engineer" 239 N.Y. at page 45, 145 N.E. at page 321. "There was nothing to show that the plans and specifications were so obviously defective that a contractor of average skill and ordinary prudence would not have attempted the construction according to the plans." "A builder or contractor is justified in relying upon the plans and specifications * * * unless they are so apparently defective that an ordinary builder of ordinary prudence would be put on notice that the work was danger-

---

1. 1912, 205 N.Y. 336, 98 N.E. 661.

2. 1924, 239 N.Y. 43, 145 N.E. 321, 41 A. L.R. 1.

3. Cortez v. Sladon Iron Works Co., 214 App.Div. 404, 212 N.Y.S. 468.

4. 239 N.Y. 43, 145 N.E. 321, 41 A.L.R. 1.

ous."" 239 N.Y. at page 46, 145 N.E. at page 321. The opinion then quoted the passages from the first case which appear above.

In the case at bar the defendants asked the judge to substitute for his instruction that the standard was that of "a competent electrical engineer," the standard of "what the ordinarily prudent electrical contractor thinks or would anticipate with regard to construction"; but he refused. It is true that, before the passage of his charge which we quoted above, he had told the jury that the standard was "the degree of care that would be exercised by an ordinary prime contractor * * * and an ordinarily prudent subcontractor"; and it is also true that he said later the subcontractors were "electrical contractors and not electrical engineers." Nevertheless, whatever the purport of these words, at best they left it uncertain whether the standard was that of a "contractor" or of an "engineer"; and if that was wrong, we must reverse the judgment, for the instruction went to the very heart of the case. The two opinions from which we have quoted made a critical distinction between an expert who prepares plans and a contractor who follows them; and meant to hold that what may appear to be an "obvious," "glaring," or "patent" error to the first, may not appear so to the second. The standard of responsibility for the ordinary contractor is that usually possessed by persons in his place; and it should be proved like any other such fact. The subcontractor at bar was *prima facie* of this class; it was only a contractor, although an electrical contractor; and it was charged with only so much competence to pass on plans as such contractors ordinarily have. There was no evidence on that issue; the only witness whom the plaintiff produced was an electrical engineer who testified how such an engineer would judge the construction on Pole No. 1422. So far as appears, the subcontractor had no such engineer in its employ, and the record was destitute of any evidence from which a jury could infer that to such a contractor the rigging of Pole No. 1422 was "obviously" or "glaringly" dangerous. Since Ryan v. Feeney & Sheehan Building Co., supra,[5] made such evidence a condition upon a contractor's liability, the judgment against the subcontractor cannot stand.

The same considerations do not apply to the contractor. Not only did it have in its employment an electrical engineer, Davies; but he assumed to oversee the performance of the subcontractor's contract. He made periodic inspections of the work as it progressed; and after it was completed he was one of a party of six who went over the whole to estimate how much was due on the job, for the subcontract had been on a "unit price" basis. In this party were two representatives of the Army, two representatives of the contractor and two representatives of the subcontractor, neither of whom was an electrical engineer. The contractor seeks to minimize the importance of this survey on the ground that it was only to foot up the items recoverable; but that will not serve. It is of course true that as between itself and the Army, the contractor was not interested in whether the construction was safe for third persons, but only whether it conformed to the plans and directions. But all the surveys, and particularly the last, showed that the contractor was not content to be limited to such acquaintance with the construction of a high tension system as might be usual among such contractors; but that on the contrary it thought that its interests demanded the scrutiny and supervision of an electrical engineer. Having employed such a specialist, the law of New York imposed upon it a duty measured by the skill of that specialist; it had removed itself from the class of "ordinary contractors." It was correct, therefore, to charge the jury that, if an electrical engineer would have thought the rigging of Pole No. 1422 "obviously" or "patently" improper, the contractor was liable. Our opinion on the first appeal did not, it is true, distinguish between the two defendants, for neither of

5. 239 N.Y. 43, 145 N.E. 321, 41 A.L.R. 1.

them had put in any evidence. We did not, and could not, know whether the subcontractor had assumed the role of an electrical engineer; though it is only fair to add that it was not unnatural for the judge to assume that the rule applied to both defendants.

Next is the question whether the contractor is excused, because at some time after the work was completed the new "jumper" was substituted for the original, as we have described. If this departure from the original construction added to the risk, there would be force in such an objection, but there is no evidence that it did. So far as appears, a separate "jumper" with two "Burndy connectors" is no more likely to sag than one made of the end of one of the high tension wires, connected to the other by a single "Burndy connector." It is no excuse that someone intervened and changed the rigging; the test, as we have just said, is whether the substitution increased the risk; and the charge covered the issue adequately in the following words: "if you find that the subsequent work on the pole merely continued the patent danger which you will have found existed in the defendants' original work, then you must conclude that the improper installation was the proximate cause of the decedent's death."

There remains only the question of the decedent's contributory negligence, which has two separate legal aspects. One is whether, since the defect was obvious, the defendant was liable because of the doctrine, last declared in Campo v. Scofield, 301 N.Y. 468, 95 N.E.2d 802, that the liability in such cases does not extend to defects which are apparent to the user of the chattel or the apparatus. The other is whether the decedent was guilty of contributory negligence "as matter of law." In either aspect the question was for the jury. The decedent was not at work upon the high tension wire, had no reason to meddle with it, and did not do so. He was "tapping in" on a low voltage wire nearly four feet below, and a jury was clearly within its province in finding that a prudent lineman might have taken it for granted that the high tension wire was not

in contact with the "strain plate." As for the argument that the contractor might properly have expected that if the "jumper" sagged, anyone who had occasion to touch the guy wire would examine its whole length, that is really the same question in another form.

Judgment affirmed as to Cauldwell-Wingate Company, Inc., and Poirier & McLane Corporation.

Judgment reversed as to Port Chester Electrical Construction Corporation, and new trial ordered.