Grace A. INGHAM, as Executrix of the
Estate of Paul B. Ingham, deceased,
Plaintiff-Appellee,

v.

EASTERN AIR LINES, INC., Defendant
and Third-Party Plaintiff-Appellant,

v.

UNITED STATES of America,
Third-Party Defendant-
Appellee.

Grace A. INGHAM, as Executrix of the
Estate of Paul B. Ingham, Deceased,
Plaintiff-Appellee,

and

Rita Freedman, as Administratrix of the
Estate of Milton Freedman, deceased,
Plaintiff,

v.

UNITED STATES of America,
Defendant and Third-Party
Plaintiff-Appellant,

v.

EASTERN AIR LINES, INC., Third-
Party Defendant-Appellee.

Nos. 273, 274, Dockets 30785, 30786.

United States Court of Appeals
Second Circuit.

Argued Dec. 13, 1966.

Filed Feb. 14, 1967.

John J. Martin, New York City (Frank A. Weidknecht, III, Bigham, Englar, Jones & Houston, New York City, of counsel) for appellant Eastern Air Lines, Inc.

John C. Eldridge, Atty., Department of Justice, Washington, D. C. (Barefoot Sanders, Asst. Atty. Gen., Joseph P. Hoey, U. S. Atty., for the Eastern District of New York, and Morton Hollander,

Atty., Department of Justice, Washington, D. C., on the brief; Wallace E. Maloney, Atty., Department of Justice, Washington, D. C., of counsel), for appellant United States of America.

Lee S. Kreindler, New York City (Milton G. Sincoff, Stanley J. Levy, Kreindler & Kreindler, New York City, of counsel), for appellee Grace A. Ingham.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge.

During the past half century we have witnessed the metamorphosis of air travel from a pioneering effort to a mode of transportation that is commonplace for millions of Americans. Yet despite the phenomenal advances which have been made in the technology of the industry, airplane crashes, often unexplained, continue to distress us.

The present suits arose from a plane crash which occurred at Idlewild International Airport (now Kennedy International Airport) on the evening of November 30, 1962. Eastern Air Lines, Flight 512 (hereafter referred to as EAL 512), en route from Charlotte, North Carolina to New York City, crashed while attempting to land on Runway 4 Right, which at the time of the accident was engulfed in swirling ground fog. Twenty-one passengers and 4 crew members perished, while some 28 to 30 other persons were injured.

Numerous separate actions were filed in the District Court against Eastern Air Lines (Eastern) under the court's diversity jurisdiction, and against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Eastern's alleged liability was premised in the main on allegations that the crew of EAL 512 failed to exercise due care in operating the aircraft, and that this negligence was one of the causes of the tragedy. The asserted liability of the government was based on the claim that poor visibility was a factor in the crash and that a substantial contributing and concurrent cause of the accident was the negligence of the Air

Traffic Controllers and the United States Weather Bureau observer in failing to provide accurate and up-to-date weather information.

The present actions, one against Eastern and one against the government, with each defendant filing third party claims against the other for indemnity, were selected as "test cases" to determine the issues of liability and the right to indemnity.[1] The parties waived a jury, and the cases, limited to the issues of liability and indemnity, were tried by Judge Abruzzo. After 19 trial days, the court filed its opinion in which it found that the accident had occurred because of the concurrent negligence of Eastern and the government. It also found that neither defendant was entitled to indemnity from the other. The court properly certified these cases for appeal under 28 U.S.C. § 1292(b), and we subsequently granted leave to Eastern and the government to prosecute these interlocutory appeals.

In order to unravel the rather complicated issues which confront us, we will first discuss Eastern's liability, then proceed to consider the liability of the government, and finally examine both defendants' claims that they are entitled to indemnity.

*Eastern's Negligence*

1. *The Approach*

■ The facts, as developed at trial, reveal that EAL 512, a DC–7B four-engine aircraft, arrived over the New York City area at approximately 9:00 P. M. on November 30, 1962. The crew previously had been informed that due to adverse weather conditions the flight might have to be diverted to Philadelphia. While in its holding pattern, the aircraft was advised that "there was pretty bad

fog on the airport," and that as a result "some [planes] are making it and some are not."

At approximately 9:37, Approach Controller Ketterman, an employee of the Federal Aviation Agency (FAA), cleared EAL 512 for an instrument landing system (ILS) approach to Runway 4 Right.[2] Such an approach required the controller to guide the aircraft by radar until the plane intercepted a localizer beam, at which point the crew assumed full navigation of the plane.

It is an extraordinary circumstance that one of the fortunate passengers who survived the crash, assiduously observed the plane's landing approach. Such eyewitness evidence, usually lacking in airplane crash cases, is especially valuable in determining whether the crew performed in a negligent manner.

The witness, Frank Kolarek, who had occupied a window seat in the rear of the plane, provided detailed testimony dealing with EAL 512's landing approach. It was a coincidence that the witness was a licensed pilot who owned his own plane. He also had taken over 100 commercial flights. A motion picture cameraman by trade, he was trained to observe details and, indeed, did. Kolarek testified that he saw EAL 512 cross Runway 4. Right from the right at an angle over the red lights which mark the beginning of the runway. Despite the apparent lack of alignment with the runway, the plane continued its fatal approach. Its position was evidently not corrected, for as Kolarek went on to testify, the plane was not aligned with the painted white lines he observed on the runway, but instead proceeded at an angle of 20°.

Kolarek's damaging testimony was not the only evidence indicating that the plane was improperly aligned during its

---

1. Many of the plaintiffs in the other actions signed stipulations agreeing to be bound by the decisions on liability in the present cases.

2. There are various categories of air traffic controllers: the Air Traffic Control Center Controllers, the Approach Controllers, and the Local Controllers. In

the present case, the New York center was in contact with Flight 512 up to and during part of the time that it was in its holding pattern. Then the flight was turned over to Approach Controller Ketterman, who guided it into its ILS approach, at which time a Local Controller took over.

attempted landing. The physical facts of the crash, which were stipulated to by Eastern at the trial, revealed that Runway 4 Right was 150 feet wide with 25 feet of asphalt shoulders on either side. Despite the width of the runway, the plane made its initial impact at a point 423 feet to the left of the center line of the runway (348 feet from its extreme left side), while the main portion of the wreckage came to rest 610 feet to the left of the center line (535 feet to the left of the runway's edge). The mute wreckage of the aircraft thus corroborated Kolarek's testimony that EAL 512 crossed the runway at an angle from the left, and continued its approach despite its improper alignment. With this and other evidence which we need not repeat properly before him, Judge Abruzzo correctly concluded that Eastern, which was responsible for the safety of its passengers,[3] was negligent in continuing its landing approach after losing alignment with the runway.

### 2. The "Missed Approach"

■ The case against Eastern, however, was not restricted to evidence that the plane was improperly aligned. It also appeared that when the crew finally decided to terminate the improper approach, the "missed approach" maneuver was performed in a negligent manner.

We have already noted that when an airplane executes an ILS landing it is guided by radar until it intercepts a localizer beam. This interception, it appears, occurs at a point beyond the runway's so-called "outer marker." If the aircraft remains on the localizer beam, a visual display and audible signal will occur in the cockpit when the plane passes over the outer marker. The crew thereby is informed that the airplane is 2.7 nautical miles from the runway's threshold, on an extended center line, and that the plane's altitude is 747 feet. Upon passing the so-called "middle marker," a similar display and signal occur, which alert the crew that the plane is then six-tenths of a nautical mile from the beginning of the runway and 209 feet above it. It is at this point—the middle marker—that a critical operation is to be performed. The pilot must direct his visual attention outside the cockpit to determine if his craft is in a proper position to land. If, as a result of this action, he concludes that the airplane is not properly positioned, he must execute what is referred to as a "missed approach."

This procedure we have outlined is necessary, we are told, because pure instrument landings are not feasible; the pilot must be able to see the runway in order to land his plane safely. Accordingly, each category of aircraft has a specified minimum visibility requirement which must be met before the pilot may attempt a landing. The specified minimums for EAL 512—a DC–7B—were a ceiling of 200 feet and one-half mile of visibility. Thus, the runway had to be clearly visible to the pilot when the plane was one-half mile from the threshold of the runway and 200 feet above the ground. This distance corresponded to the middle marker, and it is for this reason that the pilot should have made his observations when the plane passed that point.

Eastern's Flight Operations Manual clearly specifies that "a missed approach will be executed when visual contact has not been established when minimums have been reached or at any time visual contact is lost after descent has been made to minimums." And Eastern conceded that it was possible to make a missed approach from as low as 50 feet, while Captain Krasky, Eastern's Manager of Flying, testified that he had ex-

---

3. Civil Air Regulations promulgated by the Civil Aeronautics Board reveal that the safety of the passengers is at all times the responsibility of the carrier. Section 40.351 provides:

(c) *Responsibility of pilot in command.* The pilot in command shall during flight time be in command of the airplane and crew and shall be responsible for the safety of the passengers, crew members, cargo and airplane.

ecuted missed approaches from as low as 25 feet.

It is clear from all the testimony that the missed approach maneuver is basic to safe flying and one with which all commercial pilots must be completely familiar. Indeed, the procedures for its execution were detailed in Eastern's DC–7B Flight Manual. Briefly, it stated that the captain must first apply or call for power, usually METO power (maximum except take-off) although with flaps and gear down and the speed reduced for landing, T. O. power (take-off) may be required. It continued that, as power was applied, the nose of the aircraft should be raised, and when a positive rate of climb was achieved, the wing and flaps should be returned to take-off position,[4] and the gear should be brought up. Captain Krasky was clear in his testimony that the flaps and gear should never be retracted before a positive rate of climb had been established; otherwise, the aircraft will descend at an even greater speed.

Despite these established procedures, which were well-known to the crew, it has been conceded by Eastern that at the time of initial impact with the ground not a single one of EAL 512's four engines was producing power equal to METO.[5] Moreover, the landing gear, which Kolarek specifically stated had been lowered, was found fully retracted, while the wing flaps were in take-off position. Theodore Perry, Eastern's expert witness, testified that it would take at least nine seconds to raise the flaps and gear. Surviving passengers, however, testified that they had felt the thrust of the engines only three to five seconds before impact, thus indicating that the flaps and gear were raised *before* additional power was provided. These facts, plus other evidence

introduced at the trial, support Judge Abruzzo's finding that the crew of EAL 512 deviated from the procedures for a missed approach established by Eastern's own Flight Operations Manual. It was within the province of the judge to conclude that the failure to follow these instructions constituted conduct which did not measure up to the proper standard of care. See, e. g., Citrola v. Eastern Air Lines, Inc., 264 F.2d 815 (2d Cir. 1959); Danbois v. New York Cent. R. R. Co., 12 N.Y.2d 234, 238 N.Y.S.2d 921, 189 N.E.2d 468 (1963). We are unable, therefore, to fault Judge Abruzzo's finding that the crew of EAL 512 negligently and improperly executed a missed approach.

### 3. *The Bird Strike Theory*

██ Unable to explain the crew's inability to land the plane safely, Eastern propounded the engrossing theory that the accident was caused by a "great black backed gull" striking the airplane. Apparently conceding that a 3 to 5-pound bird could not knock its 96,000 pound airliner from the sky, Eastern instead argued that the collision with the gull may have distracted the crew just long enough to make it impossible to execute a missed approach.

The difficulty with Eastern's bird strike theory is that it is highly conjectural and not supported by any convincing evidence. It is true that the carcass of a gull was discovered on the afternoon following the crash, at a point approximately 3700 feet from where the airplane made its initial impact. But the mere presence of a dead bird near the scene of the crash is hardly convincing proof that it was the cause of the accident. In fact, the evidence indicated that the death of the gull and the crash of the plane were totally unrelated. No feathers or other bird remains were found on the wreckage

---

4. During the landing approach, the flaps should be either at 30° or 50°. The missed approach procedure calls for the flaps to be returned to the take-off position of 20°.

5. According to Eastern's Manual, METO power is 2600 RPM's and 2700 brake horsepower, while T. O. is 2900 RPM's

and 3250 brake horsepower. At the time of impact, however, the four engines were producing 2474, 2445, 2453 and 2422 RPM's respectively, and 2290, 2170, 1990 and 2135 brake horsepower. Surviving passengers stated that they felt a surge of power just before impact, but that the plane did not gain altitude.

of the aircraft, nor were any metal fragments or paint found on the carcass of the gull. Moreover, a member of the Armed Forces Institute of Pathology who examined the dead bird concluded that it had been dead 3 or 4 days before the crash occurred. Confronted with these facts and testimony we cannot say that Judge Abruzzo was clearly in error when he rejected Eastern's bird strike defense.

### The Government's Negligence

1. *The Duty to Report Weather Conditions*

We now turn our attention to the evidence that was introduced to prove negligence on the part of the government. As we have previously noted, EAL 512 received various weather advisories as it approached New York City and circled above in its holding pattern. The crew was informed of the adverse weather conditions which existed at Idlewild, and of the possibility that they might have to divert to Philadelphia. The flight eventually came under the direction of controller Ketterman, who, as we have noted, was an FAA employee. He advised the crew shortly after 9:24 P.M. that the weather at Idlewild was "sky partially obscured, visibility one and one-half miles with fog." The visibility subsequently decreased to one mile, and Ketterman reported this fact at about 9:30 to the planes with which he was in communication.

At exactly 9:32:49—the precise moments being of some importance to this phase of the case—Kelley, the coordinator in the "IFR Room," [6] and also an FAA employee, was disseminating weather information to the various controllers, and announced in a "louder than normal voice" that the tower reported a further reduction in visibility to three-quarters of a mile. Despite this announcement Ketterman advised the crew at 9:33:57— more than a minute after Kelley's announcement—that the visibility was still one mile. The erroneous report of existing weather conditions was the last weather information relayed to the crew before the plane crashed 12 minutes later at approximately 9:45.

After reviewing this evidence, Judge Abruzzo decided that the government had breached its duty to report accurately current and changing weather conditions to the crew, and that this failure was the proximate and contributing cause of the accident. This duty he found set forth in § 265.2 of the Air Traffic Control Procedures Manual of the FAA which provides:

At locations where official weather reports are obtained by the controllers through routine procedures and the ceiling and/or visibility is reported as being at or below the highest "circling minima" established for the airport concerned, *a report of current weather conditions, and subsequent changes, as necessary,* shall be transmitted as follows:

\* \* \* \* \* \*

B. By approach control facilities, to all aircraft at the time of the first radio contact *or as soon as possible thereafter,* \* \* \*. (Emphasis added.)

The district judge concluded that the controller's failure to report the change in visibility from one mile to three-quarters of a mile was a breach of the provisions of § 265.2, because this was "necessary" information which should have been conveyed to the crew "as soon as possible." The omission by the controller, the judge determined, constituted evidence of negligence on the part of the government.

The government challenges this holding. Relying on a myriad of complex regulations, it argues that the basic responsibility for supplying weather information to the crew and for insuring that

---

6. "IFR" stands for "instrument flight rules." The approach controllers work in what is known as the "IFR Room," which is at a lower level than the tower cab where the local controller is located.

Kelley, the coordinator in the IFR Room, was responsible for receiving weather information and disseminating it to the approach controllers.

visibility is adequate for a safe landing, belongs to the carrier, while the main function of the Air Traffic Controllers is to maintain traffic separation and to prevent mid-air collisions. This contention, however, blinks at the question, since it is undisputed that § 265.2 requires the controller to transmit *some* weather information. The issue, as we see it, therefore, is not *whether* the government had a duty to provide such information, but rather what was the *scope* of that duty.

Before we determine what weather conditions should have been reported, it is necessary to have an understanding of the method employed to measure visibility. On the night of the accident, three kinds of visibility observations were being made at Idlewild. A special electronic device known as a Runway Visual Range (RVR) was measuring the horizontal visibility in the area near the threshold to Runway 4 Right. The RVR consists of 2 components—a projector and a detector. They measure the transmissivity—the ability of the air to transmit light—of the atmosphere between the two components. The information is transmitted to the Weather Bureau office where it is computerized and conveyed to the tower for use by the controllers. The RVR, designed to report what a pilot in a moving aircraft will see, took observations every minute. Ordinarily, these are the controlling observations and they determine whether the visibility is adequate for landing. On the evening of the accident, the RVR reported values of less than 1000 feet—well below EAL 512's minimum landing requirement. Earlier that evening, however, the RVR had been declared inoperative because of some mechanical failure.[7]

Visibility observations (surface visibility) were also taken by the U. S. Weather Bureau observer at or near ground level. During the critical period of approximately 12 minutes when no weather conditions were reported to the crew, these observations indicated that the visibility of Runway 4 Right had declined to one-quarter of a mile—also below the plane's minimum requirement for landing.

The third set of observations (tower visibility) were taken by an FAA employee in the tower cab at the top of the control tower. These observations—the only ones which remained above the aircraft's minimums—were being reported to incoming aircraft by the controllers.[8]

The government's position, succinctly stated, is that § 265.2 required the approach controller to advise pilots of changed conditions only when the controlling visibility fell below the aircraft's minimum landing requirement. Since EAL 512's minimum was one-half mile, and since the controlling visibility was above that figure, the government contends that Ketterman was under no ob-

---

7. The RVR is equipped with a special warning device to report the possibility of transmission errors. The warning consists of "red balls," which are red over-lights superimposed on the readings that are transmitted. At approximately 8:35 on the evening of the crash, Keepers, the Watch Supervisor, observed a "red ball" on the values coming from Runway 4 Right and displayed in the IFR Room. Despite attempts to locate the difficulty, the "red balling" continued until 10:10. During the intervening period, Bradley, the Weather Bureau observer whose job it was to decide if the RVR system was to be declared inoperative, decided that it was, and took it out of operation.

Plaintiff-appellee contends that the government's employees acted negligently, and that as a result the RVR system was not in operation at the time EAL 512 made its landing approach. Judge Abruzzo rejected this claim, and we agree with him that under the existing regulations the employees acted in a reasonably prudent manner.

8. Plaintiff-appellee contends that under existing weather conditions at the time of the accident, surface visibility rather than tower visibility should have been controlling. The District Court did not rule on this issue, the resolution of which depends on whether the tower cab was above the fog. At trial, conflicting evidence was introduced on this question. Since we conclude that the government was negligent even if the tower observations were controlling, we do not reach this contention.

ligation to inform the crew of the drop from one mile to three-quarters of a mile.

 We are unable to accept the government's inordinately narrow interpretation of the phrase "current weather conditions, *as necessary*" (emphasis added). The government is of course correct when it argues that § 265.2 did not require it to report *all* changes in weather conditions. The words "as necessary" must be read to have some meaning. But because the government was not required to report all changes, it did not follow as a matter of course that it was obliged to report only those changes which occurred when weather conditions had descended below required minimums. A more meaningful and reasonable interpretation of § 265.2, we believe, is that it required the approach controller to report those subsequent changes which, under all the circumstances, the crew would have considered important both in determining whether to attempt a landing, and in preparing for the weather conditions most likely to be encountered near the runway. In our view, a drop in visibility of *25%*, from one mile to three-quarters of a mile, bringing existing weather conditions dangerously close to landing minimums, is such a critical change that, in the interests of safety, it should have been reported to the crew of EAL 512.

This is especially true in view of the fact that the Weather Bureau observer had reported visibility to be one-quarter of a mile—less than EAL 512's required landing minimum. Moreover, he in-

formed the IFR Room that the portion of the sky obscured by fog and clouds had increased from two-tenths to eight-tenths; and other pilots had reported considerable difficulty in landing and taking off due to the adverse weather conditions. Indeed, the approach controllers were aware that some pilots even had been forced to execute missed approaches. Assuming, *arguendo*, that this supplemental information did not have to be reported to the crew, it should have indicated to controller Ketterman that weather conditions were deteriorating seriously, and that the tower visibility reading of *three-quarters of a mile* might not truly reflect the conditions which an incoming pilot would encounter. At the very least, however, the RVR and surface visibility readings should have made it plain that the *one mile* figure which had been reported to the crew was deceptive, and that more current information was "necessary" and properly should be provided.[9]

Our conclusion that the change in visibility should have been reported is in tune with the heavy degree of reliance which passengers place upon the government for insuring the safety of their flights. While air travel in this jet age has become commonplace, we know too well that there is always lurking the possibility of tragic accidents capable of snuffing out the lives of hundreds in a mere matter of seconds. Much of the success in preventing such disasters can be attributed to the federal government's assumption of the supervision of commercial flying;

9. It is of interest that Nelson and Speiselman, the other two approach controllers on duty with Ketterman, did report the drop in visibility to other aircraft soon after it was announced. It is true that they were handling fewer aircraft than was Ketterman; nevertheless, the fact that the other controllers believed that the drop in visibility was important enough to report to the aircraft with which they were communicating, is some evidence that Ketterman was negligent in not immediately reporting this information to the flight.

The government argues, however, that Ketterman did report the change in visi-

bility when he saw it posted on the sheet before him. By that time, though, EAL 512 had been given an approach clearance and had been turned over to the local controller; therefore, the government contends, Ketterman was not able to advise the crew of the reduced visibility. This argument, however, is without merit. As we have previously noted Kelley, the IFR Room coordinator, in a "louder than normal voice," announced the change in visibility to all three controllers. When this announcement was made, Ketterman was still in contact with EAL 512, and thus had sufficient opportunity to relay this information.

and public confidence in air travel has been fostered in large measure by knowledge that our government, recognizing the high stakes involved, is constantly overseeing the carrier's operations in order to promote safety.

Moreover, we can give little weight to the government's claim that since its initial decision to provide weather information was a gratuitous one, it could proceed with impunity to violate its own regulations and act in a negligent manner. Dean Prosser has put this doctrine to rest in his treatise: "[T]he good Samaritan who tries to help may find himself mulcted in damages, while the priest and the Levite who pass by on the other side go on their cheerful way rejoicing." Prosser, Law of Torts 333 (3d Ed.1964).

■ It is now well established that when the government undertakes to perform services, which in the absence of specific legislation would not be required, it will, nevertheless, be liable if these activities are performed negligently. Thus, for example, though the government may be under no obligation in the absence of statute to render medical care to discharged veterans, when it decides to provide such services and does so negligently, it has been held liable under the Tort Claims Act. United States v. Brown, 348 U.S. 110, 75 S.Ct. 141, 99 L. Ed. 139 (1954).

■ Assuming, *arguendo*, that in the absence of FAA regulations approach controllers would not have to advise incoming aircraft of weather conditions, the decision to provide such information would lead carriers and their pilots norm-

ally to rely on the government's performance of this service. The carriers, relying on the FAA to keep their pilots informed of current weather conditions, would be likely to reduce both the quantity and quality of their own weather reporting. In light of this reliance, it is essential that the government properly perform those services it has undertaken to provide albeit voluntarily and gratuitously. In any event, the failure of the government to inform the crew that the visibility had dropped from one mile to three-quarters of a mile was a violation of § 265.2's command that "subsequent changes, as necessary, shall be transmitted," and Judge Abruzzo properly concluded that this omission constituted negligence on the part of the government.[10] See Citrola v. Eastern Air Lines, supra; Danbois v. New York Cent. R. R. Co., supra.

### 2. *Proximate Cause*

The government argues, however, that even assuming it breached its duty to the passengers by failing to report weather conditions, the omission was not the proximate cause of the accident. We cannot agree. We note that the district judge found that if the crew had been notified of the changing weather conditions, the pilot might have decided to divert to Philadelphia rather than to attempt an ILS landing at Idlewild. Moreover, the judge observed, if the crew had known of current conditions, they might have maneuvered the plane differently, and could have been ready and able at an earlier time to execute a missed approach.

These findings by the judge are not clearly erroneous. While Eastern expect-

10. In its brief, plaintiff-appellee urges that the government should also be held negligent because it failed to observe and report the so-called "quadrantal visibility," which plaintiff-appellee contends was below EAL 512's authorized landing minimums. Quadrantal visibility is a weather condition where the visibility in one section of the airport is different, by one-eighth of a mile or more, from the prevailing visibility. If the quadrantal visibility is in the quadrant of the airport where an airplane is to land, it con-

trols, and if below minimums, an approach is prohibited. Plaintiff-appellee contends that there was quadrantal visibility in the area of the airport where EAL 512 was to land. This visibility, it claims, was below one-half mile so that an approach would not have been permitted had the Weather Bureau observers reported the visibility. The District Court's opinion did not consider this claim, and we do not reach it since we have already concluded that the government was negligent on other grounds.

ed its pilots to land if the visibility was above the craft's required minimums, the pilots were not required to do so. The final decision either to attempt a landing or divert to another airport was in the hands of the pilot. This is quite properly so since he is in the best position to observe and judge the actual effect of the weather on the plane's landing approach. If the pilot does decide to attempt a landing, information concerning recent and significant changes in weather conditions is essential to his mental computations and the exercise of his judgment. As we have noted, Eastern's Flight Operations Manual specifies that a missed approach *must* be executed if visual contact is lost after the aircraft has passed the middle marker; but the pilot has little guarantee of successfully performing this maneuver once the plane has gone much below 50 feet. A missed approach required precision coordination by the crew, and the success or failure of the operation, when the plane was at a very low altitude, depended on just how rapidly the crew reacted. Thus, it was of the utmost importance that the crew not be lulled into a false sense of security. The pilot should have been told that weather conditions were becoming marginal, and that he might well encounter less than minimum visibility upon reaching the runway. This information would have signaled to the pilot that a missed approach might have to be executed. Indeed, as we have noted, the evidence discloses that on the evening of the crash several pilots were forced to execute missed approaches even though the controlling visibility was reported as being above minimums.

▆▆▆▆▆ In light of these circumstances, we agree that the negligent failure of the government to inform EAL 512 that visibility had dropped to three-quarters of a mile—only slightly above the craft's minimum—was a proximate and concurrent cause of the accident.[11]

3. *Defenses Based on the Tort Claims Act*

Falling back on its second line of defenses, the government argues that even if it did breach a duty, and even if that breach was the proximate cause of the accident, nevertheless, the facts of the present case bring this action within several of the exceptions to the Tort Claims Act, and therefore the government is exempt from liability. We are referred to 28 U.S.C. § 2680, which provides in part:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an *act or omission* of an employee of the Government, exercising due care, *in the execution of a statute or regulation,* whether or not such statute or regulation be valid, or based upon the *exercise or performance or the failure to exercise or perform a discretionary function* or duty on the part of a federal agency or an employee of the Government, whether or not the dis-

---

11. We reject the government's contention that under New York law it must be relieved of liability because the failure of the crew to execute properly a missed approach was an intervening superseding cause. This Court has held:

[I]t is not the law of New York that the intervention of a succeeding fault as such gives immunity to an earlier wrongdoer. The presence of the second wrongful act in the chain of circumstances which leads from the wrongful act to the injury is legally irrelevant, unless its occurrence is so unexpected that the injury is not to be a reasonably foreseeable result of the first act. The question must be determined as though the second act were

itself innocent. Person v. Cauldwell-Wingate Co., 176 F.2d 237, 241 (2d Cir.) (L. Hand, J.), cert. denied, 338 U.S. 886, 70 S.Ct. 189, 94 L.Ed. 544 (1949). See also Ammar v. American Export Lines, 326 F.2d 955 (2d Cir.), cert. denied, 379 U.S. 824, 85 S.Ct. 48, 13 L. Ed.2d 34 (1964).

We are unable to conclude that the accident was not reasonably foreseeable as a result of the government's negligent failure to provide up-to-date weather information. Indeed, the government was the original wrongdoer whose negligence set in motion the entire chain of events which finally culminated in the tragic crash. The government's negligence was ever present.

cretion involved be abused. (Emphasis added.)

\* \* \* \* \* \*

(h) Any claim arising out of \* \* misrepresentation \* \* \*.

Based on this section the government raises three separate contentions.

**a. "Execution of a Regulation" Exception.**—The government claims that it may not be held liable because the purpose of excepting acts or omissions which occur as part of the execution of a regulation is to bar "tests by tort action of the legality of \* \* \* regulations," Dalehite v. United States, 346 U.S. 15, 33, 73 S.Ct. 956, 966, 97 L.Ed. 1427 (1953); and, the government argues, we have in effect invalidated § 265.2. This position is without merit. We have not questioned the validity of that section, but instead have determined that this regulation was violated because "necessary" weather information was not provided.

The government's argument might have merit if § 265.2 stated that the controller shall advise incoming flights of changes in weather conditions "only when the controlling visibility falls below the flight's minimums." If such language were contained in the regulation, then the execution of a regulation exception would prevent us from finding the government negligent if its controller failed to report weather changes when the visibility was above the minimums. But § 265.2 is not so phrased; instead, it provides that the controller shall advise of weather changes "as necessary." Therefore, in order to determine whether there had been compliance with this regulation, it was necessary for us to decide whether the weather information which the controller failed to report was "necessary." And having determined that "necessary" information was not reported, the inescapable conclusion is that the regulation was violated. The government cannot, therefore, disclaim its liability on the ground that the omission occurred in the execution of a regulation, for, in fact, it failed to comply with the regulation by omitting to furnish necessary information.

**b. The "Discretionary Function" Exception.**—The government also argues that reporting weather changes to incoming flights when the visibility is above the minimums is a "discretionary" function and therefore under § 2680(a) it cannot serve as the basis for imposing tort liability. This argument also lacks merit. When the government decided to establish and operate an air traffic control system, that policy decision was the exercise of "discretion" at the planning level, and could not serve as the basis of liability. See Dalehite v. United States, supra. But once having made that decision, the government's employees were required thereafter to act in a reasonable manner. A failure to do so rendered the government liable for the omission or commission. Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). Thus, it has been decided that the government can be held liable for the negligence of its air traffic controllers. See Eastern Air Lines v. Union Trust Co., 95 U.S.App. D.C. 189, 221 F.2d 62, aff'd sub nom., United States v. Union Trust Co., 350 U. S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955). "[D]iscretion was exercised when it was decided to operate the tower, but the tower personnel had no discretion to operate it negligently." 221 F.2d at 77.

In the present case, even if we were to assume that the creation of the FAA regulations was a discretionary function, it is true nevertheless that no discretion was left to the controller as to whether to comply with § 265.2 once it was promulgated. The section required the controller to report "subsequent changes, as necessary" and his failure to report such changes cannot be viewed as "the failure to perform a discretionary function or duty."

**c. The Misrepresentation Exception.**—The government's final argument under the Tort Claims Act is that the negligent failure of its employees to convey weather information was a "misrepresentation" which cannot serve as the basis for liability. 28 U.S.C. § 2680

(h), supra. It is true, as the government contends, that the misrepresentation exception of the Act applies to negligent as well as to intentional misrepresentations. United States v. Neustadt, 366 U.S. 696, 702, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961). Moreover, we agree that a misrepresentation may result from the failure to provide information, as well as from providing information that is wrong. See National Mfg. Co. v. United States, 210 F.2d 263, 276 (8th Cir.), cert. denied, 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108 (1954). Nevertheless, the government's reading of the misrepresentation exception is much too broad, for it would exempt from tort liability any operational malfunction by the government that involved communications in any form.

The government concedes there are diverse kinds of negligence which could be said to involve an element of misrepresentation but which Congress did not intend to be encompassed by the exception contained in § 2680(h). The government refers us, however, to the *National Mfg. Co.* case, supra, in which the Eighth Circuit held that the failure of government employees to warn of a coming flood, was conduct that came within the misrepresentation exception. But the heavy reliance of the government on that case is misplaced in view of the Supreme Court's subsequent opinion in United States v. Neustadt, supra.

*Neustadt* involved an inaccurate building appraisal by the Federal Housing Administration (FHA) which was reported to and relied on by the plaintiff, a home buyer. The appraisal was made to determine the availability of FHA mortgage insurance. While the Court held that an action against the government was barred by the misrepresentation exception, the opinion carefully limited the holding:

> Our conclusion neither conflicts with nor impairs the authority of Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, which held cognizable a Torts Act claim for property damages suffered when a vessel ran aground as a result of the Coast Guard's allegedly negligent failure to maintain the beacon lamp in a lighthouse. Such a claim does not "arise out of * * * misrepresentation," any more than does one based upon a motor vehicle operator's negligence in giving a misleading turn signal. As Dean Prosser has observed, many familiar forms of negligent conduct may be said to involve an element of "misrepresentation," in the generic sense of that word, but "[s]o far as misrepresentation has been treated as giving rise in and of itself to a distinct cause of action in tort, it has been identified with the common law action of deceit," and has been confined "very largely to the invasion of interests of a financial or commercial character, in the course of business dealings." 366 U.S. at 711, 81 S.Ct. at 1302, n. 26.

The *Neustadt* case involved business dealings of a financial or commercial character with the government, a totally different setting from the instant action. The *Indian Towing* case, on the other hand, bears close resemblance to the present controversy. The Coast Guard's negligent failure to maintain the beacon lamp in the lighthouse is closely akin to the controller's failure to provide up-to-date weather conditions. Both cases thus involved a negligent failure on the part of government employees to perform a duty they had undertaken—to provide information and warnings to travelers of the waterways in one case and airways in the other. And in both cases, the breach of this duty resulted in injuries and deaths. Where the gravamen of the complaint is the negligent performance of operational tasks, rather than misrepresentation, the government may not rely upon § 2680(h) to absolve itself of liability. See Eastern Air Lines v. Union Trust Co., supra; United Air Lines, Inc. v. Wiener (United States v. Wiener), 335 F.2d 379, 398 (9th Cir.), cert. dismissed, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964).

*Indemnity*

 The final issue remaining for our consideration is whether either

240

defendant is entitled to indemnity from the other.[12] Since we have concluded that both defendants were negligent, and that the conduct of each was a proximate and concurrent cause of the accident, it is clear that both Eastern and the government may be held liable for the full amount of the damages.[13] Prosser, supra at 265. It is true, however, that under certain circumstances a right of indemnity will arise by operation of law to prevent what would otherwise be an unjust or unbalanced result.

 Various formulas have been offered for deciding when this doctrine will come into play. Often the courts of New York have spoken in terms of allowing the "passive" tortfeasor to recover from the "active" one, McFall v. Compagnie Maritime Belge, 304 N.Y. 314, 107 N.E.2d 463 (1952). "Active" negligence, it is recognized, may consist of either an act of omission or commission. Jackson v. Associated Dry Goods Corp., 13 N.Y. 2d 112, 242 N.Y.S.2d 210, 192 N.E.2d 167 (1963). Some courts have stated that the doctrine will be triggered when the "faults differ greatly in gravity," Slattery v. Marra Bros., 186 F.2d 134, 138 (2d Cir. 1951), and that the crucial determinant is the "factual disparity between the delinquency" of the defendants. McFall v. Compagnie Maritime Belge, supra 304 N.Y. at 330, 107 N.E.2d 463.

 Under none of these proposed formulas, however, are we able to conclude that either defendant is deserving of indemnity from the other. We view the government's negligence in failing to provide "necessary" weather information to the crew as being negligence of a continuing nature, which set in motion a chain of events that eventually ended in a crash and the death of 25 individuals. Eastern, on the other hand, was also an active tortfeasor. As a common carrier, it owed the highest degree of care for the safety of its passengers. And, as we have indicated at some length, the crew negligently approached the runway and they carelessly performed a missed approach.

In sum, we perceive no "factual disparity between the delinquency" of the defendants which would lead us to conclude that an unjust or unbalanced judgment would result if the tortfeasors are held to have been in *pari delicto* and are not allowed indemnity.

*Conclusion*

Having fully reviewed the record in this case, we recognize that we shall never know with absolute certainty why the crew of EAL 512 was careless in its approach and unable to execute properly a missed approach. This inability to explain the precise cause of an airplane crash is not a rarity in cases where the members of the crew—who would have been most familiar with the tragic events—have perished. In such instances, the court is required to reconstruct the events leading to the crash from the available evidence (often the silent charred wreckage) and from the reasonable inferences to be drawn from such evidence. We do not blink at the obvious when we say that conclusions thus grounded can never be proven with mathematical exactitude.

The fact remains, however, that the airline was entrusted with the lives of its passengers and was responsible for their safety. A tragic accident occurred which, on the evidence before us, could have been avoided if both tortfeasors had performed as reasonably required. The sad ending was that 25 persons lost their lives in the fiery aftermath. In summary, we find that the record clearly supports Judge Abruzzo's findings that Eastern's airplane lost alignment with the runway, but nevertheless continued

12. We are discussing the right to indemnity—the shifting of the entire loss from one tortfeasor to another—rather than the right to contribution, which is the distribution of the loss proportionately among the tortfeasors.

13. Of course, plaintiff-appellee is not entitled to a double recovery of the amount of the judgment.

its landing approach; that, when the crew finally did attempt a missed approach, they either failed to follow the instructions which Eastern had promulgated, or carried them out improperly. It is also clear in this case that the government, by neglecting to inform the crew that the tower visibility had dropped, in the manner we have already indicated, violated § 265.2 of the FAA's Air Traffic Control Procedures Manual, because "weather conditions, and subsequent changes, as necessary" were not reported to the approaching plane. Moreover, we hold that the negligence of both tortfeasors in causing the accident was concurrent, that they were *in pari delicto* and thus neither was entitled to indemnity.

We have carefully reviewed all of the parties' contentions, and find no reason to upset Judge Abruzzo's judgment.

Affirmed.